Desmond, J.
Mildred K. Tuttle, widow of the decedent, and Theodore Solomon, a special guardian of infant contingent remaindermen of a testamentary trust, appeal to this court as of right from an Appellate Division order which modified a Surrogate’s decree by striking one $10,000 item from a claim allowed by the Surrogate against the estate to respondent CarlD., *163 Thorny, who is an executor-trustee of the estate, for alleged accounting services rendered, some to decedent during his lifetime and some to the estate after his death. The respondents on this appeal are Thorny and his two coexecutors-trustees. The only real question of this appeal is whether Thorny, because he was an executor and trustee, was absolutely and as matter of law debarred from collecting any additional fees for his accounting services. Both courts below held that there was not such an absolute prohibition in law. With that we agree.
William R. Tuttle died in 1953 leaving* an estate consisting mainly of 975 shares (appraised at about $180,000) out of a total of 977 outstanding shares of Kurlash Company, Inc., a manufacturer of cosmetic devices. Tuttle left a widow and two grown children. The will left his personal property to the widow and disposed of the residue by bequeathing 2% thereof to his sister, 2% to his son and 2% to his daughter and putting the remaining 94% into three trusts. Half of that remaining 94% went into a trust with the widow as life beneficiary and a power in her to appoint the remainder by her will, the other half of the 94% being ultimately divided into two trusts with the son and daughter as the respective secondary life beneficiaries and the remainders thereof going to the issue of those two children. The will named as executors and trustees G-enesee Valley Trust Company of Rochester, David H. Shearer, who had been the attorney for decedent, and Carl D. Thorny, a certified public accountant who had done accounting work (hereafter described) for decedent and for the Kurlash Company during decedent’s life.
After these executors-trustees had qualified as such on decedent’s death, the two individual executors plus a representative of the corporate executor became three of the five directors of Kurlash Company, the other two directors being the widow and Mrs. Helen Lamb, decedent’s sister, who had been a trusted employee of decedent’s company during* his life. The widow was appointed president and voted a salary. Executor Shearer continued on as attorney for the estate. Executor Thorny, the accountant, became treasurer of Kurlash without salary but continued to do accounting work for both Kurlash and the estate for which accounting services he made charges (here disputed) to the corporation and to the estate.
*164 The parties and the courts below apparently considered that because the estate owned virtually all of the stock of Kurlash and because the executors became the controlling directors of Kurlash, their duties in the two capacities were indistinguishable and the corporate entity is to be disregarded in fixing the duties of the executors-trustees, which is, of course, correct (see Matter of Hubbell, 302 N. Y. 246, 254; Matter of Horowitz, 297 N. Y. 252).
The accounting work involved in this controversy was actually done not by Thorny individually but by an accounting partnership in which Thorny had an interest of about 80% but we will deal with the matter (as the parties do and as the courts below did) as if Thorny individually performed the services.
During a period of a few months following decedent’s death, Kurlash paid Thorny $6,095 to cover bills for accountancy services rendered by Thorny before decedent’s death. Then, for services rendered after the death and until November, 1955, Thorny rendered bills to Kurlash in a total amount of $14,525 which was paid by the corporation. These total payments just above described and totaling just over $20,000 came to Thorny through corporate checks, most of which were signed by the widow as president. It is clear that the widow never objected to any of these payments on any ground. (Of course, her acquiescence, even if binding on her, is not binding on the contingent remaindermen infants represented by the special guardian here, but the fact of her consent is significant.) Then, in December, 1955, Thorny sent to Kurlash a bill of $10,000 as a‘final charge for work he had done between November, 1949 and December, 1955 in connection with the income tax troubles of decedent and the corporation, to which we will refer later in more detail. Those difficulties were as to Tuttle’s and Kurlash’s income taxes for the years 1945 to 1952 inclusive, and involved deficiency claims by the government totaling nearly $500,000 and had resulted in an indictment of decedent for income tax fraud on which, in March, 1953, his plea of nolo contendere was accepted and sentence suspended.
This 1955 bill of Thorny for $10,000 was on a round figure basis and was, as we have said, in addition to the bills which had been rendered by him from time to time for accounting and tax services to Tuttle, Kurlash and the estate. This $10,000 *165 bill has never been paid and was held valid by the Surrogate but disallowed by the Appellate Division. Apparently Mrs. Tuttle did not take any position as to this $10,000 charge until April, 1956, when her attorney wrote a letter in which he objected to it. To make it a little clearer: after decedent’s death Thorny collected from Kurlash a total of about $20,000 for services performed during decedent’s lifetime and after-wards. After decedent’s death Thorny sent three other bills for services performed partly before and partly after death in the total amount of $15,635 which was allowed in full by the Surrogate but reduced to $5,635 by the Appellate Division.
On July 6,1956 the widow began a proceeding to oust Thorny and to revoke his letters, her petition alleging that his charges for services were excessive and were totally improper as constituting self-dealing with the estate by an executor-trustee. To this petition the trust company and Shearer filed a joint answer and Thorny a separate answer. On July 11, 1956, a few days after the filing of the widow’s petition for the removal of Thorny, the three executors filed an intermediate accounting and petition for judicial settlement which papers had been in preparation at the time when the widow had started her separate proceeding for ouster. The widow then filed objections not only to the payments already made to Thorny but to his unpaid claims of $15,635 above.described.
In September, 1956 the two proceedings came on for trial together before the Surrogate. It was recognized by the parties that the issues in each proceeding were the same, that is, as to whether Thorny had validly collected and could properly collect accountant’s fees in addition to commissions for his services as accountant for after-death services and as to whether he had properly charged the estate for such services rendered before Tuttle’s death. In the testimony of attorney Shearer and accountant Thorny we find a description of Thorny’s relations with and services to decedent and to Kurlash before decedent’s death. It appears without dispute that Thorny began to do accounting work for decedent and Kurlash about 12 years before Tuttle’s death, which services in the early years consisted merely of preparing income tax returns for Kurlash and for decedent from the books without any auditing work. Then in 1949, about three and one-half years before Tuttle’s death, *166 an examination by Federal tax authorities of the corporation and individual returns brought down onto Tuttle a heavy load of trouble. The Federal authorities asserted that a summer home, title to which was in Tuttle and which was occupied by Tuttle and his family, had been elaborately developed at a large cost out of funds of the corporation. The Federal agents took the position that these moneys thus taken out of the corporation for Tuttle’s personal benefit were in effect dividends paid by the corporation to Tuttle and that, accordingly, both he and the corporation owed income taxes on all that money. The total of the claimed taxes, plus interest and penalties, which the Federal Government first claimed as a result of these transactions, was just under $500,000, an amount larger than the combined assets of Tuttle and the corporation. Thorny’s testimony (and to some extent that of attorney Shearer) describes the elaborate process of auditing, investigation, discussion and negotiations for settlement that followed. During this period Tuttle was, as aforesaid, indicted in the United States District Court, Western District of New York, and had the services of Mr. Shearer as his lawyer plus other lawyers and of Mr. Thorny, who was busy for years before decedent’s death in doing the accounting work involved. Ultimately and in 1955, long after decedent’s death, the civil aspects of this income tax deficiency matter were compromised by an agreement approved by the executors, directors and court, as well as Federal authorities, whereby the corporation agreed to pay and the Government agreed to accept some $150,000 payable $1,500 per month, which monthly payments the corporation has since been making. Besides helping to arrange a settlement of the Federal tax claims, Thorny did other similar work as to New York State tax deficiencies. Also, after Tuttle’s death and pursuant to a unanimous resolution of the Kurlash directors, he made a complete audit of the company’s affairs as of the date of death. Both courts below found that all Thorny’s charges were reasonable except the $10,000 which was disallowed by the Appellate Division. That $10,000 item is not before us since Thorny did not appeal.
In November, 1956, while the main proceedings were pending before the Surrogate, Thorny petitioned the Surrogate to allow Tiim to resign an executor-trustee. In the Surrogate’s decree of intermediate judicial settlement, which was appealed to the *167 Appellate Division, the court denied this petition without prejudice to its, renewal on a final judicial settlement of the accounts, of the executors. Mrs. Tuttle and the special guardian both appealed to, the Appellate Division and to this court from that part of the Surrogate’s decree which refused to allow Thorny to resign, (as well as from the decrees, re accountant’s fees), hut the Appellate Division’s modification let stand this part of the Surrogate’s decree as to the proffered resignation. The latter is, a discretionary matter and presents no question for us..
The only question before us is this: is there an absolute prohibition against an executor’s collecting, besides his commissions, additional compensation for services to the estate as an accountant? We all know that the courts from the. earliest times to, the present have held that an executor for his. services as such cannot collect anything beyond the statutory commissions (Collier v. Munn., 41 N. Y. 143). Until the amendment in 1914 of section 2753 of the Code of Civil Procedure (now Surrogate’s Ct. Act, | 285), this meant that an executor who was an attorney could not even collect from the estate attorney’s fees in addition to commissions. However, it has likewise been the rule from early times (see Lent v. Howard, 89. N Y. 169, 179) that when an executor performs services for the estate which are not properly part of his executorial duties, he may be compensated for those extra services. Professor Scott in his work on Trusts (2d ed., Vol. 3, pp. 1934-1935) discusses this whole problem in all its aspects and summarises the present law as follows: “ By the weight of authority in the United States * * * the trustee is entitled to extra compensation for extra
services, subject to the safeguard that the compensation is given only to the extent that the court may award it.” In other words, as the Lent case (supra) made clear long ago, the rule has never in modern times gone so far as to say that if an executor is a plumber he cannot send a bill to the estate for plumbing work on the estate’s property or that an executor who is an employee in the decedent’s business may not be paid a salary for working in the business. There is not much authority applying these rules to the services of an executor who is also an accountant but there are two cases in the lower courts which say that, when a testator appoints as an executor his own accountant, justice and common sense require that for *168 special accountancy services this executor may have accountant’s fees in a reasonable amount as allowed by the Surrogate (Matter of Wexler, 9 Misc 2d 735; Matter of Sherman, 9 Misc 2d 731). The Wexler decision, although not binding on us, is well reasoned and directly in point.
Of course it would have been better practice for the executors to obtain court authorization before paying Thorny for the predeath services and to have gotten the Surrogate’s authorization to continue to employ him as accountant, but this is a matter of propriety rather than law and the Surrogate and the Appellate Division have now in fact approved all these payments (except, of course, the $10,000 which is no longer in dispute). Mrs. Tuttle argues that an affirmance here would be destructive of a good rule and would “ constitute an open invitation to fiduciaries to seek extra compensation for extra services voluntarily supplied, whether the same be desirable, necessary, or even competent ”. There is, of course, such a danger, but no danger will be done if the courts do their duty as they did it here. These accountancy services were necessary and they were a continuation of a job commenced during decedent’s life. This businessman-testator, making his will when his income tax troubles were at their worst, could never have intended by naming his trusted accountant as one of his executors-trustees to produce a situation where the estate would either have to discharge this trusted accountant after decedent’s death and hire someone else to do the work, or force Thorny to do it without pay.
The order of the Appellate Division should be affirmed, with costs to all parties appearing separately and filing separate briefs payable out of the estate.
Chief Judge Conway and Judges Fuld, Froessel, Van Vooehis and Burke concur; Judge Dye taking no part.
Order affirmed.