764 F.2d 102
 Frank MUSICO, Jr., as Personal Representative of the Estate
of Francis G. Musico, deceased, Plaintiff-Appellee,
v.
CHAMPION CREDIT CORPORATION, Lexington Maintenance
Corporation, Jerob Brokerage Corporation and
Jerome Garfield, Defendants-Appellants.
 No. 445, Docket 84-7607.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 26, 1984.
Decided June 10, 1985.
 
 John R. Bartels, Jr., White Plains, N.Y., for defendants-appellants.
 Douglas Kramer, New York City (Baden Kramer Huffman and Brodsky, P.C., New York City, of counsel), for plaintiff-appellee.
 Before FRIENDLY, WINTER and PRATT, Circuit Judges.
 GEORGE C. PRATT, Circuit Judge:
 
 
 1
 Defendants Champion Credit Corporation, Lexington Maintenance Corporation, Jerob Brokerage Corporation, and Jerome Garfield appeal from an amended judgment of the United States District Court for the Southern District of New York, Lloyd F. MacMahon, Judge, awarding $403,221.46 in damages and prejudgment interest to plaintiff Frank Musico, Jr., as personal representative of the estate of his father Francis G. Musico, Sr. The defendants had acted as agents for the Musico, Sr. estate in handling various aspects of the estate's taxicab business, and the district court held them liable to the estate for breach of fiduciary duty, constructive fraud, and conversion. Damages represented, first, moneys which the court found had been collected by the defendants on behalf of the estate, but which had not been passed on to the estate or otherwise accounted for; and second, agency fees which the estate had paid to defendants, but which were now forfeited because of defendants' breach of their fiduciary obligations.
 
 
 2
 We affirm in part and reverse in part, and remand for recalculation of damages. We affirm that part of the district court's judgment holding defendants liable for breach of fiduciary duty, constructive fraud, and conversion, and that part imposing damages and prejudgment interest for the funds collected on behalf of the estate and unaccounted for. We reverse that part of the judgment requiring defendants to forfeit all agency fees. The agency fees were earned for separate tasks governed by four separate agency agreements, and for a number of those tasks there is no claim or proof of breach of duty to the estate, nor any claim or proof that performance of those tasks was tainted by defendants' misconduct. We therefore remand so that the district court may modify the computation of damages to eliminate the forfeiture of fees for services properly performed, while keeping the forfeiture of fees paid for services improperly performed.
 
 BACKGROUND
 
 3
 During the 1970's Francis G. Musico, Sr. ("Musico, Sr.") was the sole owner of forty-three New York corporations, each of which owned two New York City taxi medallions. In early 1977, three years before his death, Musico, Sr. sold the stock of thirty of these corporations, using conditional sales agreements which provided him with "buy-back" options that could be exercised if the conditional purchasers defaulted on their installment payments. At the same time the taxi medallions owned by the remaining thirteen corporations were also conditionally sold.
 
 
 4
 Musico, Sr. died on January 25, 1980, while visiting New York from his home in Florida. At the time of his death, and since at least June of 1979, the business of collecting the installment payments on the sales of stock and taxi medallions was handled on an agency basis by Jerome Garfield ("Garfield") and Champion Credit Corporation ("Champion"), a New York corporation wholly owned by Garfield. Within three days of Musico, Sr.'s death his son, Frank Musico, Jr. ("Musico, Jr."), met with Garfield and gave him a power of attorney which the parties intended as authorization for him to continue running the Musico, Sr. taxicab business in New York. This was the first of the four agency agreements relevant to this appeal.
 
 
 5
 In late March of 1980 the Surrogate's Court in Florida formally appointed Musico, Jr. as personal representative of his father's estate, and in that capacity he signed the other three agency agreements with Garfield and others on October 2, October 10, and November 20 of 1980. The October 2nd agreement gave Garfield, Champion, and Ronald Stoppelman agency powers to collect payments from the sale of stock of the Musico, Sr. corporations. The October 10th agreement gave Garfield a special power of attorney to act on five specific matters, at least four of which apparently involved Musico, Sr. taxi corporations; this agreement was signed by Musico, Jr. not only as representative of the estate, but also as president of the corporations involved in the matters specified in the agreement. The November 20th agreement gave Garfield a general power of attorney with broad powers. All of the agency agreements continued in effect until August, 1982, when Musico, Jr. terminated them along with all of Garfield's powers of attorney.
 
 
 6
 Shortly after terminating these agreements, Musico, Jr. filed this lawsuit alleging that Garfield and his corporations, while acting as agents for the estate, had collected funds on behalf of the estate but had neither deposited those funds with the estate nor accounted for them in any other way. Federal jurisdiction was based on diversity of citizenship, 28 U.S.C. Sec. 1332. The funds at issue came from the lease and sale, after Musico, Sr.'s death, of taxicab medallions originally owned by ten of the Musico, Sr. corporations. These medallions, or the corporations owning the medallions, had been conditionally sold in 1979 or 1980, but the buyers had defaulted and the "buy-back" options were exercised. There is no disagreement over the fact that Garfield and his corporations handled these buy-backs, as well as the subsequent lease and sale of the reacquired medallions; there is, however, a great deal of disagreement over the exact details of how defendants handled these matters, as well as the extent to which Musico, Jr. knew and approved of what defendants did.
 
 
 7
 Plaintiff's version of the facts is the following. On January 30, 1980, Garfield, acting under the power of attorney from Musico, Jr., signed an agreement leasing the reacquired medallions to an independent company, Four Square Operating Corporation, for rental payments of $800 per medallion per month. Under Garfield's direction these payments were first sent to Lexington Maintenance Corporation ("Lexington"), a New York corporation controlled by Garfield; Lexington then remitted to Champion not the full $800, but only $528 for each rental payment received. Champion, which was also collecting the regular monthly installment payments from the earlier conditional sales made by Musico, Sr., provided monthly statements to Musico, Jr. and the estate, but these statements reflected payments of only $528 per medallion, the reduced amount paid to Champion by Lexington, and they made no mention of the full amount of $800 per medallion that Lexington had received. Plaintiff claims that neither he nor the estate was ever informed of this arrangement for reduced payments, and that Lexington held back, in all, over $38,000 in rental payments which should have gone to the estate.
 
 
 8
 Plaintiff contends that similar unauthorized deductions at the time the reacquired medallions were finally sold deprived the estate of nearly $152,000. According to plaintiff, when the medallions were sold Garfield directed the payments to Jerob Brokerage Corporation ("Jerob Brokerage"), which Garfield controlled, and only the reduced amount of these payments was reported and transmitted to the estate.
 
 
 9
 Defendants' account of the medallion reacquisition, lease, and sale presents a somewhat different picture--or rather, several pictures, for defendants have given at least three different and partially inconsistent accounts of what occurred. One version, presented at trial and also in defendants' initial appellate brief, is that Garfield reacquired the medallions for Musico, Sr. in 1979 and 1980, but that in doing so he spent considerable amounts of his own money; the personal funds Garfield spent, he claims, constituted loans to Musico, Sr. which his estate was obligated to pay back. A second version of the crucial events, also presented at trial and in defendants' initial appellate brief, maintains that Garfield did not reacquire the medallions for Musico, Sr., but that Garfield took title to the medallions in his own name, taking over the installment payments due under the original conditional sales agreements. In this version the fact that Garfield retained title, or at least "equitable" title, to the medallions was actually part of a scheme designed by Musico, Jr. and the estate's accountants to reduce estate taxes by keeping the value of the medallions out of the estate. Finally, a third version is set out for the first time in defendants' reply brief on appeal. In this third account, Garfield spent his own money to acquire the medallions not in his own name, and not for Musico, Sr. personally, but for the Musico, Sr. corporations which originally held them.
 
 
 10
 In all these versions defendants claim that the channeling of payments through Lexington and Jerob Brokerage was fully understood by Musico, Jr. Under the first and third versions Garfield claims that any funds from the lease and sale of the medallions which he held back were, in fact, repayments of loans owed to him. He also claims that Musico, Jr. not only was informed about the loan repayments, but also understood and approved them. Under the second account there were no loans, but the funds were properly withheld because Garfield as the substitute purchaser and lessee was obligated to pay the estate only the amounts due on the original conditional sales contracts, and not the higher amounts earned under the new lease and sale of the medallions which occurred after Musico Sr.'s death. Under any version of what happened, Garfield also contends that he had no personal duty to account to the estate, since the written agency agreement of October 2, 1980, places the duty to account only on Champion and not on Garfield personally.
 
 
 11
 The district court, after a four day bench trial in January 1984, completely rejected defendants' second version of the facts. The third version was not presented to the trial court, so no explicit determination on it was made; implicitly, however, the court rejected it, as is explained below. As for the first account, the district court did accept at least part of Garfield's story, but it found many of his contentions to be incredible. In its memorandum decision the court found:
 
 
 12
 It appears that Garfield did expend funds to buy back the conditionally sold medallions during Musico, Sr.'s lifetime. Plaintiff admitted that he was aware that these reacquisitions were financed at least in part with Garfield's personal money. Furthermore, plaintiff discussed these expenditures with Garfield and knew that Garfield intended to reimburse himself out of estate income. Garfield, however, never revealed the exact figures to plaintiff. Nor did he ever specifically explain the manner in which he intended to repay himself. Obviously, even Garfield does not know how much he loaned the estate because he cannot document an exact figure. Moreover, at no time prior to this lawsuit did Garfield assert any claim against the estate for this indebtedness. In light of Garfield's inability to produce credible and convincing evidence of these loans, we find that he has failed to prove their existence.
 
 
 13
 * * *
 
 
 14
 * * *
 
 
 15
 The inescapable conclusion from Garfield's inability to produce adequate records or satisfactorily answer questions is that he diverted estate funds and freely commingled them with his personal funds and the funds of his companies. He cannot, or will not, unravel the recordkeeping fiasco he has created.
 
 
 16
 The court's conclusions that the defendants are liable for breach of fiduciary duty, constructive fraud, and conversion followed from its finding that "defendants improperly retained certain moneys collected on behalf of the estate". Plaintiff had also made a RICO claim under 18 U.S.C. Sec. 1962 based on alleged violations of the federal mail fraud statute, but the district court found that plaintiff had not proved the elements necessary to show a RICO violation, and its decision on this point has not been appealed.
 
 
 17
 Damages represented both the $190,047.30 which the court found had been withheld from the estate, and $123,895 in agency fees already paid to the defendants by the estate, fees which the court determined were forfeited and must be repaid because of the defendants' breach of fiduciary duty. On plaintiff's motion under Fed.R.Civ.P. 52(b), the court amended its judgment to increase the damage award to include prejudgment interest.
 
 DISCUSSION
 A. Jurisdiction
 
 18
 No challenge to federal jurisdiction was made in the district court or, indeed, in the initial briefs filed on this appeal. In their reply brief, however, defendants argue for the first time that the federal courts lack subject matter jurisdiction over the case because there is no diversity of citizenship between plaintiffs and defendants, once the real parties in interest are recognized. Without a basis for diversity jurisdiction the case cannot be heard, defendants say, for it falls within no other area of federal subject matter jurisdiction.
 
 
 19
 This challenge to jurisdiction rests on carefully distinguishing the Musico, Sr. taxi corporations from the estate which owns their stock. In their reply brief defendants argue that the taxi medallions involved in the present dispute were reacquired in 1979 and 1980 not for Musico, Sr. personally nor for his estate, but for his corporations. They then claim that the dispute over the lease and sale of those medallions concerns an agency agreement between the defendants and the Musico, Sr. corporations which owned the medallions, and that the dispute does not involve the quite distinct agency agreement they had with the estate which dealt only with the sale of stock owned by the estate. The conclusion from all this, according to defendants, is that the Musico, Sr. corporations are the real parties in interest here and that only the corporations can bring suit for breach of the fiduciary duty covering the sale and lease of the medallions. They maintain that plaintiff, as representative of the estate, has "no standing to represent the interests of Musico, Sr.'s New York corporations which conditionally sold their assets". Yet if the Musico, Sr. corporations are viewed as the real parties in interest diversity jurisdiction is destroyed, since New York citizenship would then be shared by both the defendants and the corporate plaintiffs. The Musico, Sr. corporations and the three defendant corporations are all New York citizens; Musico, Sr. and Musico, Jr. are from Florida, and Garfield is a citizen of either New York or Connecticut.
 
 
 20
 The district court's decision did not explicitly address the points central to defendants' argument, but it implicitly rejected them by disregarding the Musico, Sr. corporations' nominal role as owners of the taxi medallions, by treating the estate as the equitable owner of the medallions, and by treating the estate as the principal in the agency agreements covering the medallions' lease and sale. The district court's approach was fully in keeping with what counsel brought to its attention. Defendants, that is, never brought to the trial court's attention the argument they now make on appeal over distinguishing between the estate and the corporations. We therefore conclude that, in the circumstances of the present case, defendants have waived any right to argue on appeal that the estate is not the alter ego of the corporations and that the estate had no right to sue as it did.
 
 
 21
 Finding a waiver on this point does not mean, of course, that there was anything misguided in the way the district court treated the estate and the estate's corporations. The court had ample reason in this case to view the estate as the real party in interest. The appropriateness of finding that defendants have waived their right to argue about the real party in interest is reinforced by the independent strength of the reasons for ignoring the separate status of the Musico, Sr. corporations owned by the estate.
 
 
 22
 Well known New York case law involving taxicab corporations makes it clear that the distinction between a corporation and its owner may be disregarded "whenever necessary 'to prevent fraud or to achieve equity'." Walkovszky v. Carlton, 18 N.Y.2d 414, 417, 276 N.Y.S.2d 585, 223 N.E.2d 6 (1966) (quoting International Aircraft Trading Co. v. Manufacturers Trust Co., 297 N.Y. 285, 292, 79 N.E.2d 249 (1948)). The question of whether to pierce the corporate veil usually comes up in a situation where an outside party would like to disregard the corporation's independent status, and where the corporate owner resists any such disregard. The present case is unusual because it raises the question of piercing the corporate veil in reverse, for it is the corporate owner who wants to disregard the corporations' separate status.
 
 
 23
 Although a number of courts have justified reverse disregard on the basis of equity, see W. Fletcher, 1 Cyclopedia of the Law of Private Corporations Sec. 41.70 (perm. ed. 1983), there are some New York cases which assert that "the corporate veil is never pierced [in reverse] for the benefit of the corporation or its stockholders." Colin v. Altman, 39 A.D.2d 200, 202, 333 N.Y.S.2d 432, 433 (1st Dept.1972) (no authority cited); Ipco Hospital Supply Corp. v. Consolidated Edison Co., 100 Misc.2d 789, 420 N.Y.S.2d 78, 80 (1979) (citing only Colin v. Altman, 39 A.D.2d 200, 333 N.Y.S.2d 432 (1972)). Such a blanket statement is not quite accurate, however, for there are New York cases involving corporations owned by estates in which the separate status of the corporation was disregarded for the benefit of the owner, or in which the question of whether this should be done was not closed as a matter of law. For example, in In re Weinstein, 25 A.D.2d 776, 269 N.Y.S.2d 475, 476 (2d Dept.1966), appeal dismissed, 19 N.Y.2d 599, 278 N.Y.S.2d 387, 224 N.E.2d 883 (1967), the appellate division held that
 
 
 24
 [T]he Surrogate possesses the equitable power to disregard the corporate entity and may proceed to treat the estate fiduciaries and their corporate problems with respect to disposition of the corporate assets, and its effect upon the estate, upon the realistic basis that the fiduciaries and the management of the corporations are one and the same [citations].
 
 
 25
 Cf. In re Tuttle's Estate, 4 N.Y.2d 159, 173 N.Y.S.2d 279, 282, 149 N.E.2d 715 (1958) ("because the estate owned virtually all of the stock of Kurlash [corporation] and because the executors became the controlling directors of Kurlash, their duties in the two capacities were indistinguishable and the corporate entity is to be disregarded in fixing the duties of the executors-trustees"); In re Hubbell's Will, 302 N.Y. 246, 254, 97 N.E.2d 888 (1951) (when a trustee holds working control of stock in a corporation owned by estate, trustee may be required to treat corporate transactions as though they were his own transactions as trustee); In re Horowitz' Will, 297 N.Y. 252, 258, 78 N.E.2d 598 (1948) (position of director of corporation owned by estate may be "superimposed" on position of executor of estate); In re Stulman's Will, 146 Misc. 861, 263 N.Y.S. 197, 217 (1933) (holding that "under normal circumstances" a corporation is distinct from its owner, but leaving open the possibility that in "rare" circumstances executors could disregard a corporate entity entirely owned by testator).
 
 
 26
 To achieve equity in the present case, which deals with the overall relationships between the parties, it is fitting that In re Weinstein be followed and that the separate status of the corporations wholly owned by the estate be disregarded. The equities call for this because in dealing with one another the parties themselves disregarded the corporate form. When Garfield dealt with third parties such as Four Square Operating Corporation, which leased the reacquired medallions, he observed the distinction between the estate and the taxi corporations owned by the estate; when outsiders were not involved, however, Garfield simply treated the estate as the alter ego of the Musico, Sr. taxi corporations. The estates went along with this approach, evidently seeing little need to do otherwise. Garfield, after all, was not misled, since he had long-standing and intimate knowledge of the entire Musico, Sr. taxicab business, and he knew that the assets of the taxi corporations were being liquidated for the ultimate benefit of the estate and those the estate represented.
 
 
 27
 The underlying commercial relationships between the defendants, the estate, and the estate's corporations come out quite clearly in the monthly accounting reports sent by Champion to the estate from January 1980 until August 1982. During this time Champion collected payments from the lease and sale of medallions as well as the sale of stock in the Musico, Sr. corporations. Champion's monthly accounting reports all begin by listing the total income received from payments made to Champion, and they then list various deductions for such things as advances "to the Musico Estate", lease of cars, Internal Revenue Service payments in the name of particular taxicab corporations, other payments made in the name of particular taxicab corporations owned by the estate, and loan repayments to Chemical Bank which are not identified with any particular corporation. The bottom line in these accounting statements, though, is always the amount "Due to Estate" of Musico, Sr., as calculated by subtracting the deductions from the total payments received. In other words, the accounting made no effort to distinguish the income which might go to a particular corporation owned by the estate, from the income which went directly to the estate. The accounting was in terms of a lump sum "due to the estate". The commercial basis of the parties' relationships was the manifest understanding that the estate was the alter ego of the corporations.
 
 
 28
 Defendants' treatment of the estate as the alter ego of the taxi corporations continued, moreover, at the district court trial and even in the first stages of this appeal, as is made clear by the defendants' own brief. Adjacent lines of that brief indiscriminately attribute ownership of the medallions first to Musico, Sr. or his estate, and then to the Musico, Sr. corporations, with no attempt to explain whether or not it makes any difference if title is held by one of these entities or another. On pages two and three of their brief, for example, defendants first say
 
 
 29
 At issue in this lawsuit is the income from the lease and sale of 10 of these 86 medallions which Garfield had (i) repurchased for Musico, Sr. in 1979 and 1980 with loans of Garfield's funds, then (ii) leased out to new operators for Musico, Sr., and (iii) finally resold for the Musico estate. [Emphasis added].
 
 The next two lines are
 
 30
 These 10 leased medallions belonged to seven taxicab corporations, wholly owned by Musico, Sr. at the time of his death. The conditional sales contracts had been reacquired for Musico, Sr. by Garfield when the buyers defaulted. [Emphasis added].
 
 
 31
 Defendants' brief also cites directly to the trial transcript in support of claims that Garfield repurchased the medallions in 1979 "on behalf of Musico's father", that Lexington was forwarding $528 of each $800 medallion rental payment "to the estate", and that the money from the final sale of the medallions "would also go to the estate" after a portion was deducted to repay Garfield for the funds he loaned "the estate" when reacquiring the ten conditionally sold medallions.
 
 
 32
 In short, because of the defendants' own disregard of the separate status of the Musico, Sr. corporations from at least 1980, and because of their own acceptance during most of this litigation of the Musico, Sr. estate as the real party in interest in the lease and sale of the medallions, there was no error in the district court's regarding the estate as the proper plaintiff. Since the district court's approach was justified, and since defendants waived any right to question it on appeal, equity would only be frustrated, rather than achieved, if Garfield could now use the existence of the Musico, Sr. corporations as a means of escaping an unfavorable district court decision.
 
 
 33
 B. Defendants' Liability for Funds from the Lease and Sale of the Taxi Medallions
 
 
 34
 Five arguments are advanced by defendants for reversing that part of the district court decision holding them liable for breach of fiduciary duty, constructive fraud, and conversion of the funds withheld from the lease and sale of the taxi medallions. None of the arguments is persuasive.
 
 
 35
 1. The first argument for reversal is that Garfield as an individual had no duty to account to the estate because the written agency agreement signed October 2, 1980, placed the duty to account on Champion alone, rather than on Garfield personally. True, that document places the primary duty to give a monthly accounting on "The Corporate Agent", but it also requires that Garfield "provide with the accounting a listing of all receipts received and copies of invoices paid." Moreover, by its own terms the agreement applies only to the sale of the Musico, Sr. stock and a few other particular matters, and not to the lease and sale of the taxi medallions. The alleged misdealing in this case concerns the medallions, whose lease and sale was authorized not by the October 2 agreement but by the other dealings of Garfield and Musico, Jr., including either or both of the powers of attorney signed in January and November 1980. Under those arrangements Garfield had broad authority to act for the estate, and nothing in the record exempts him from an agent's normal duty to account for his trust.
 
 
 36
 2. Defendants' second argument for reversal is that there was no conversion because Garfield was authorized by Musico, Jr. to retain part of the funds from the medallions' lease and sale as repayment for loans made to Musico, Sr. or his estate. Whatever authority Garfield had, however, came with an accompanying duty to account, as explained in the previous paragraph, and since he could not account for what he had withheld he was liable for conversion. See George Haiss Mfg. Co. v. Becker, 198 A.D. 123, 189 N.Y.S. 791 (1921).
 
 
 37
 The district court carefully explained the factual basis for its conclusion that Garfield had not accounted for the funds he withheld. This conclusion rested
 
 
 38
 primarily on the constant inability of defendants to provide straightforward, or for that matter, even understandable records. * * * Garfield testified that he had used approximately $130,000.00 of his own money to finance the buy-backs. Nevertheless, at no time was he able to document this assertion with specific records of the expenditures or with cancelled checks clearly indicating their purpose. Defendants' Exhibit H, which purports to be buy-back checks, is practically meaningless absent some explanation which connects the checks to personal funds of Garfield. Garfield never provided any such explanation. * * *
 
 
 39
 Similarly, Garfield asserted at trial that he retained the downpayments from the resales in order to repay himself for the money used to finance the buy-backs. He was totally unable to produce records of the receipt of the downpayments or their distribution. * * * Garfield testified that he kept $94,000 of the $122,000 collected in downpayments as reimbursements and used the remaining $28,000 for expenses. He could not, however, account for the breakdown with any coherent records.
 
 
 40
 * * *
 
 
 41
 * * *
 
 
 42
 Obviously, even Garfield does not know how much he loaned the estate because he cannot document an exact figure. * * * In light of Garfield's inability to produce credible and convincing evidence of these loans, we find that he has failed to prove their existence.
 
 
 43
 Nothing before us on this appeal supplies the explanations and documentation which the district court found missing from Garfield's version of what happened. We therefore have no reason to reject the district court's findings or its holding that Garfield withheld funds without authorization because he failed to prove the existence of the alleged loans.
 
 
 44
 As part of his argument that no conversion occurred, Garfield also claims that plaintiff should be estopped from complaining about the funds withheld from the estate because Garfield's actions were all part of plaintiff's plan to hide estate assets and reduce estate taxes. This estoppel argument was not pleaded as a defense in defendants' amended answer and was therefore waived. Fed.R.Civ.P. 8(c); Tornello v. Deligiannis Brothers, Inc., 180 F.2d 553 (7th Cir.1950); 5 C. Wright & A. Miller, Federal Practice and Procedure Sec. 1394 (1969). Moreover, the district court implicitly rejected any claim that defendants were merely acting as part of a "scheme" designed by plaintiff, and on this record we cannot say that that rejection was erroneous.
 
 
 45
 3. Defendants' third argument for reversal is that Garfield is entitled to an offset for the funds he loaned the estate. As did the district court, we reject this argument for two reasons. One is that Garfield has simply been unable to document any specific loan, as explained above. The second is that to be binding on the estate any claim for repayment of a loan to the decedent should have been, but was not, filed in accordance with Florida law. By statute Florida requires that a claim against an estate must be "presented: (a) Within 3 months from the time of the first publication of the notice of administration, even though the personal representative has recognized the claim or demand by paying a part of it or interest on it or otherwise." Fla.Stat. Sec. 733.702(1) (1976 & Supp.1985). A claim is presented when it is filed. Id. Sec. 733.703. Absent any evidence that defendants made the required filing on the alleged loans prior to this suit, they cannot now claim them against the estate as a setoff. See Fowler v. Hartridge, 156 Fla. 585, 24 So.2d 306 (1945); Smith v. Fechheimer, 124 Fla. 757, 169 So. 395 (1936); Price v. Davis, 180 So.2d 474 (Fla.Dist.Ct.App.1965).
 
 
 46
 Defendants describe this reasoning, which was also part of the district court's opinion, as "a non sequitur " because Garfield was following the instructions of his principal, Musico, Jr., in paying himself back for the loans. The statute, however, expressly provides that the personal representative's recognition of a claim does not excuse a creditor from the filing requirement. Fla.Stat. Sec. 733.702(1) (1976 & Supp.1985); Harbour House Properties, Inc. v. Estate of Stone, 443 So.2d 136 (Fla.Dist.Ct.App.1983). An exception may be made on grounds of estoppel, but "there must, as a minimum, be some form of affirmative deception involved before the doctrine of equitable estoppel may be invoked" to escape the bar created by Sec. 733.702. In re Estate of Peterson, 433 So.2d 1358, 1359 (Fla.Dist.Ct.App.1983) (citing Rinker Materials Corp. v. Palmer First National Bank & Trust Co., 361 So.2d 156, 159 (Fla.1978)). No such "affirmative deception" has been shown here.
 
 
 47
 4. Defendants' fourth argument is that the district court misapplied New York's dead man's statute, N.Y.Civ.Pract.Law and Rules Sec. 4519 (McKinney 1983), when it prevented Garfield from testifying about conversations he had with Musico, Sr. Defendants rely on the rule that "when the executor questions his adversary as to all or part of a personal transaction with the decedent, he has 'opened the door' as to that transaction and otherwise incompetent testimony is admissible to fully explain the personal transaction in issue." In re Estate of Wood, 52 N.Y.2d 139, 146, 436 N.Y.S.2d 850, 852, 418 N.E.2d 365 (1981). The Wood case stresses, though, that this exception to the dead man's rule is "limited in application to the 'personal transaction' to which the executor ... forced another interested party to testify" and that it "does not 'open the door' to any or all personal transactions with the decedent." Id. In the case before us much of the particular questioning relied on by Garfield in his brief related to the medallion lease to Four Square. However, this was not a personal transaction between Garfield and Musico, Sr.; on the contrary it occurred after Musico Sr.'s death. In the one instance in which the plaintiff inquired of Garfield as to a personal transaction between himself and Musico, Sr., the question addressed the existence of an agency relationship between the parties governing the repurchasing of the defaulted medallions. Garfield's answer was stricken, however, presumably in application of the New York dead man's statute. If this was error, it was unquestionably harmless, in light of the district court's express finding, well supported by the evidence, that Garfield acted as an agent for Musico, Sr. during the buybacks.
 
 
 48
 5. Defendants' final argument, raised for the first time on appeal, is that the district court erred in not dismissing the suit for failure to join Ronald Stoppelman as an indispensable party. Defendants regard Stoppelman as indispensable because he was one of the signers of the October 2, 1980, agency agreement, and because he had a 47.5 percent ownership interest in Lexington; these facts, defendants claim, raise dangers to Stoppelman's interests because of the possibility of collateral estoppel in a future suit.
 
 
 49
 Garfield's belated argument is unconvincing. First, the October 2, 1980, agency agreement, to which Stoppelman was a party, covered the sale of the corporate stock, not the lease and sale of the taxi medallions which are the subject of this case. Second, the mere fact that Stoppelman has a major ownership interest in one of the defendant corporations does not, by itself, prejudice his personal rights in a future case. The decision of the district court does not find that Stoppelman breached a duty to the estate, converted the estate's funds, or engaged in fraud; and neither does our decision on this appeal. We see no reason for finding that Stoppelman is an indispensable party to this particular lawsuit. See Provident Tradesmens Bank & Trust Company v. Patterson, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968).
 
 C. Forfeiture of Fees
 
 50
 Under the district court's view of New York law, an agent who breaches his fiduciary duty is not entitled to any compensation for services he has performed for his principal, even if the services were separate from those involving the breach of duty and were, in fact, properly performed. The court therefore ordered the defendants to forfeit all fees received from the estate, including fees for services with which the estate found no fault. Fees for the collection of installment payments on the conditional sales of stock, for example, were included in the forfeiture even though there was no complaint that those collections were mishandled. In short, there was no attempt to limit the forfeiture to compensation paid for services that were either improperly performed or tainted by the breach of duty.
 
 
 51
 Whether New York rules out any apportionment of forfeiture is not, however, as simple an issue as the district court believed. Admittedly there are some older New York cases which suggest a broad rule prohibiting apportionment of forfeitures. More recent cases, though, show a trend toward the position taken in the Restatement (Second) of Agency (1958), which calls for apportioning forfeitures when an agent's compensation is allocated to periods of time or to the completion of specified items of work. As explained below, this trend, coupled with the persuasiveness of the Restatement position and with the position taken in an earlier second circuit case raising the apportionment issue, lead us to conclude that the defendants in the present case should not have to forfeit all their fees.
 
 
 52
 The older New York case law suggesting a strict rule against apportioning forfeitures of compensation can be traced to Murray v. Beard, 102 N.Y. 505, 508, 7 N.E. 553 (1886), where the New York Court of Appeals stated:
 
 
 53
 An agent is held to uberrima fides in his dealings with his principal, and if he acts adversely to his employer in any part of the transaction * * * it amounts to such a fraud upon the principal as to forfeit any rights to compensation for services. [Emphasis added.]
 
 
 54
 While this passage has been reaffirmed since it was written in 1886, Lamdin v. Broadway Surface Advertising Corp., 272 N.Y. 133, 5 N.E.2d 66 (1936), the trend in more recent cases has been away from any rigorous adherence to Murray's language. When faced with agencies where compensation has been apportioned to periods of time, courts in recent years have carefully phrased New York's forfeiture rule to allow the forfeiture to be correspondingly apportioned. See Herman v. Branch Motor Express Co., 67 Misc.2d 444, 323 N.Y.S.2d 794, 796 (N.Y.Civ.Ct.1971) (careful analysis of New York law shows that a faithless employee is deprived of his right to compensation "only for the period of his faithlessness"); see also Maritime Fish Products, Inc. v. World Wide Fish Products, Inc., 100 A.D.2d 81, 474 N.Y.S.2d 281, 287 (1984) (employer is entitled to return of compensation paid to employee "during the period of disloyalty"); St. James Plaza v. Notey, 95 A.D.2d 804, 463 N.Y.S.2d 523, 526 (1983) ("an employee may forfeit his right to compensation for services rendered by him during such periods of disloyalty"); Westwood Chemical Company, Inc. v. Kulick, 570 F.Supp. 1032, 1040 (S.D.N.Y.1983) (same); Ability Search, Inc. v. Lawson, 556 F.Supp. 9, 15 (S.D.N.Y.1981) (same), aff'd mem., 697 F.2d 287 (2d Cir.1982).
 
 
 55
 Consistent with these cases is the position taken by the Restatement (Second) of Agency (1958), section 469 of which states that an agent who breaches his duty "is not entitled to compensation even for properly performed services for which no compensation is apportioned." Comment b to Sec. 469 explains that apportionment should be in accordance with Sec. 456, and comment b to Sec. 456 states:
 
 
 56
 If an agent is paid a salary apportioned to periods of time, or compensation apportioned to the completion of specified items of work, he is entitled to receive the stipulated compensation for periods or items properly completed before his renunciation or discharge. This is true even if, because of unfaithfulness or insubordination, the agent forfeits his compensation for subsequent periods or items.
 
 
 57
 Comment d to Sec. 469 adds: "The fact that [an agent] has been disloyal or insubordinate in one transaction does not disentitle him to indemnity on account of other transactions."
 
 
 58
 The recent case law cited above is limited, it must be admitted, to agencies where compensation is apportioned to periods of time, whereas the Restatement calls for apportionment of forfeitures where compensation is apportioned not only to time periods, but also to the completion of specific tasks. Yet no modern New York case specifically and unambiguously rules out apportionment corresponding to completion of specified tasks, and we see no principled basis for applying different rules to the two situations.
 
 
 59
 Finally, the conclusion that New York would allow apportionment of forfeitures so that compensation is not lost for properly completed tasks was drawn by the second circuit when it considered the issue some forty years ago. In Trounstine v. Bauer, Pogue & Co., 144 F.2d 379, 383 (2d Cir.), cert. denied, 323 U.S. 777, 65 S.Ct. 190, 89 L.Ed. 621 (1944), Judge Swan, sitting with Judge Augustus N. Hand and Judge Clark, affirmed a district court decision which apportioned a forfeiture of fees so that the agents lost compensation only for tasks carried out improperly. Judge Swan reasoned that "[t]o deprive the defendants of these commissions would be mere punishment because they had violated their duty as to other transactions", 144 F.2d at 383, and he distinguished Murray v. Beard and other similar New York cases by pointing out that they concerned breaches of duty which had tainted all the dealings between the parties. Since the breach of duty in the case before him did not taint all dealings, however, he found that apportionment was appropriate.
 
 
 60
 Like the situation in Trounstine, defendants' breach of duty in the present case did not extend to or taint all the dealings between the parties. Those dealings included separate tasks covered by four agency agreements, two of which were carefully limited to specific, distinct matters. The agreement of October 2, 1980, provided for agency fees only for the collection of the installment payments on the conditional sales of Musico, Sr.'s stock; the agreement of October 10, 1980, did not mention fees but gave Garfield a special power of attorney for only five specific matters. Neither of these agency agreements appears to govern the separate tasks of reacquiring, leasing, or reselling the medallions, and it is only these separate tasks that were carried out in breach of defendants' fiduciary duties. The district court found no misdealing with the collection of payments on the original sales of stock, or for the five matters covered by the October 10, 1980, agreement. Moreover, there was no finding that the misdealing with respect to the lease and sale of the taxi medallions had tainted in any way the completion of the tasks governed by the October 2 and 10 agreements.
 
 
 61
 What is before us, then, is a case where the parties have apportioned various agency tasks under a number of separate agreements, where the agents engaged in no misconduct at all in carrying out the specific tasks set out in two of those agreements, and where the agents' misdealing with respect to one task has neither tainted nor interfered with the completion of the other tasks. In these circumstances we hold that New York law, like the Restatement, requires us to apportion any forfeited compensation.
 
 
 62
 We therefore remand to the district court to recalculate the amount, if any, of defendants' fees that are to be forfeited.
 
 CONCLUSION
 
 63
 We affirm that part of the judgment holding defendants liable for breach of fiduciary duty, constructive fraud, and conversion, and we affirm that part of the judgment awarding damages based on the withholding of funds derived from the lease and sale of the medallions of the ten taxi corporations. We reverse the forfeiture of fees and remand so that the district court may recalculate the amount of the forfeiture, which should not include agency fees paid for untainted, properly performed tasks. On remand the amount of prejudgment interest must, of course, be recalculated after determination of the proper amount of forfeiture. No costs.