**DESIGN STRATEGIES, INC., Plaintiff,**

v.

**Marc E. DAVIS, Info Technologies, Inc., Info Technologies Web Solutions, Inc., and John Goullet, Defendants.**

**No. 02 CIV. 5329(VM).**

United States District Court,
S.D. New York.

Aug. 11, 2005.

Jack S. Dweck, The Dweck Law Firm, LLP, New York, NY, for Plaintiff.

Leonard Alan Benowich, Roosevelt, Benowich & Lewis, L.L.P., White Plains, NY, Patrick V. DiDomenico, Richard Scott Garley, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, New York, NY, for Defendants.

Helen Bergman Moure, Preston, Gates & Ellis, L.L.P., Seattle, WA, Jason M. Butler, Sharon L. Nelles, Sullivan & Cromwell, LLP, New York, NY, for Movant.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Design Strategies, Inc. ("Design") brought this action against its former employee, Marc E. Davis ("Davis"); two corporate entities, Info Technologies, Inc., ("Infotech") and Info Technologies Web Solutions ("IT Web"); and John Goullet ("Goullet"), Chief Executive Officer of both Infotech and IT Web (collectively, the "IT Defendants," and together with Davis, "Defendants"). Design alleges that Davis, while still employed at Design, wrongfully diverted a lucrative business opportunity from Design to IT Web and subsequently benefitted from that diversion by accepting an offer of employment with IT Web. Design further alleges that the IT Defendants colluded with Davis to divert the business opportunity away from Design and ultimately to hire Davis. Defendants deny Design's salient allegations. Davis also filed a counterclaim against Design alleging that Design had wrongfully denied him payment of certain commissions to which he was entitled.

In prior rulings on the parties' respective motions for summary judgment, the Court denied Design's motion and granted in part and denied in part Defendants' motions.[1] The Court also dismissed certain of Design's claims in its rulings on Defendants' motions *in limine*. After determining that Design was not entitled to a jury trial on its surviving causes of action,[2] the Court conducted a bench trial on May 9 through 18, 2005. Design's surviving claims that proceeded to trial were: breach of fiduciary duties, aiding and abetting a breach of fiduciary duties, wrongfully inducing a breach of fiduciary duties, unjust enrichment, and unfair competition. Davis's counterclaim was also litigated at trial.

For the reasons set forth below, the Court concludes that Design has sustained its burden of proof as to its claim against Davis for breach of fiduciary duties, but that Design's remaining claims should be dismissed. The Court further finds that Davis has not sustained his burden of proof as to his counterclaim.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Design is in the business of providing trained personnel to companies needing technical support on specific projects requiring computer technology services.

---

1. The Court's Decision and Order on those motions is reported as *Design Strategies, Inc. v. Davis*, No. 02 Civ. 5329, 2004 WL 1394327 (S.D.N.Y. June 22, 2004) (*"Design I "*).

2. The Court's Decision and Order on that issue is reported as *Design Strategies, Inc. v. Davis*, 367 F.Supp.2d 630 (S.D.N.Y.2005) (*"Design II "*).

That aspect of the industry is known as "staffing." According to Design's Financial Statements, the company:

> is a provider of technically skilled individuals, hired on a temporary basis, who provide solutions to complex problems regarding computer applications predominantly to business . . . .

Typically, the services involve providing computer technology consultants with specific skills and experience to clients on a contract basis for the duration of the particular assignment. The consultants are drawn from an extensive list containing the names of qualified experts which the personnel provider maintains for this purpose. The staff supplied by Design are hired or solicited by Design pursuant to an employment agreement and are then assigned to work at the client's site under the client's supervision and on the particular temporary projects and duties determined by the client. For the four-year period 1997 through 2000, Design's financial statements indicate that over 99.5 percent of the company revenues derived from staffing services.

Marsh Newmark ("Newmark") is the President of Design and has been its sole director and shareholder since the company's founding in 1980. Newmark hired Davis in 1987 to work for Design as a sales representative. Davis was later promoted to Sales Manager. He was an at-will employee without a written agreement and was not subject to any restrictive covenant of confidentiality, non-competition or non-solicitation, as the Court determined in *Design I*. Davis's work entailed marketing Design's staffing services. He was compensated with a fixed annual salary plus commissions based on the company's monthly profits from the business he generated, which were paid at a rate of 10 percent on the first $10,000 of such profits and 20 percent on profits in excess of that amount.

Davis left Design in February 2000 to accept a position with IT Web. At the time of his departure, Davis was earning an annual salary at Design of approximately $85,000, an amount he began making in 1998 following a raise from $45,000. His commissions in his last four calendar years at Design were: 1997—$512,333; 1998—$434,212; 1999—$285,947; 2000—$73,119.

Sometime during the summer of 1999 Davis became aware from Frank Murphy ("Murphy"), a senior employee and one of his business contacts at Microsoft, Inc., that Microsoft was involved with a partner, Brill Media ("Brill"), in a venture that would be soliciting companies for a contract worth approximately $10 million. The project, which came to be known as Contentville.com ("Contentville"), entailed establishing a high-profile website using Microsoft software to engage in electronic commerce in books and related products and thus compete with similar businesses operated by Amazon.com and Barnes and Noble.

The services to be provided by the company chosen to work on Contentville involved providing computer technology "project" or "web solutions" work. Unlike staffing, web solutions work in the industry entailed providing the services of trained personnel employed by the company on its premises and using the computers and other technical equipment supplied at the provider's laboratory on specific projects to design and develop websites for clients in accordance with given specifications.

Microsoft awarded the Contentville contract to IT Web in mid-December 1999. IT Web extended an offer of employment to Davis by letter dated December 14, 1999, which Davis accepted in late January 2000. Davis began working for IT Web in early February 2000.

During the trial, Defendants moved for a directed verdict pursuant to Fed.R.Civ.P.

52(c). The Court reserved judgment in order to hear Defendants' case in chief. In addition, at the time that Defendants moved for a directed verdict, though Design had concluded the majority of its case in chief, due to difficulties in contacting two witnesses, Design had not yet presented their testimony. Because Design thus had not completed all of its evidence at the time that Defendants moved for judgment as a matter of law, the Court hereby denies Defendants' motion. Accordingly, the Court bases the following discussion on the full record of the trial.

## II. *FINDINGS OF FACT*

In light of the legal standards, articulated below, applicable to Design's claims and Davis's counterclaim, liability rests on the resolution of the following factual issues: (1) whether Davis informed Newmark of the Contentville project and made good faith efforts to obtain the business opportunity for Design; (2) whether and to what extent Davis attempted to procure that contract for IT Web; (3) whether the IT Defendants were aware of or participated in any attempts by Davis to obtain the Contentville contract for IT Web; (4) whether Design was sufficiently competitive with IT Web to render any attempts by Davis to assist IT Web disloyal to Design; (5) whether Davis or the IT Defendants played any role in causing Design not to obtain the Contentville contract; and (6) whether Design expressly consented to Davis's referral of the Contentville business to IT Web. Based on its evaluation of the documentary evidence and live testimony presented at trial, the Court makes the following findings of fact regarding these matters.

A. *DAVIS'S EFFORTS TO PROMOTE DESIGN FOR THE CONTENTVILLE CONTRACT*

The Court finds that Davis initially sought to procure the Contentville contract for Design. The trial record supports a finding that Davis promoted Design for what eventually became the Contentville contract from the time he learned about it until sometime in November 1999. The Court bases this finding on Davis's uncontroverted testimony and statements by Murphy in his deposition, portions of which were read into the trial record, that corroborate Davis's claims in this regard.

Davis testified, for instance, that he had several meetings with Murphy, starting sometime around early September 1999, at which he promoted Design as a partner for Microsoft's contemplated electronic commerce project. (*See* May 9 Tr. at 227.) Murphy similarly stated that Davis represented to him that Design had the capacity to perform the web solutions work required for such a project and sought to procure the Contentville contract for Design. (*See* May 16 Tr. at 130, 139.) Although Newmark testified that Davis mentioned the possibility of a project with Microsoft to him only on one occasion and never informed him of the details of such a project, Design did not present any evidence contradicting Davis's and Murphy's testimony that Davis had attempted to solicit the contract on behalf of Design.

B. *DAVIS'S EFFORTS TO PROMOTE IT WEB FOR THE CONTENTVILLE CONTRACT*

The Court finds that in or before early November 1999, Davis ceased attempting to solicit the Contentville contract for Design and, instead, commenced trying to promote IT Web for the contract. Davis made several admissions in this regard. First, he testified that, upon determining that Design was not willing to make the investment necessary to obtain the Contentville contract, he took several steps to inform the IT Defendants about a business opportunity with Microsoft and to encour-

age Microsoft to consider IT Web for Contentville. Specifically, he acknowledged that he informed Goullet of a possible web solutions project with Microsoft and told him that Murphy was the person to contact at Microsoft in order to pursue that project. (*See* May 10 Tr. at 50, 53.) Davis also testified that, in informing Goullet about the Microsoft project, he made "it clear to [Goullet] that time was absolutely of the essence. That if anything were to be done it needed to be done very quickly." (*Id.* at 218.)

Davis further conceded that he informed IT Web President Michael Largey ("Largey") of a web solutions business opportunity with Microsoft and that he provided Largey with the contact information for another Microsoft employee, John Gomez ("Gomez"), who was in charge of selecting a partner for Contentville. Davis testified that he instructed Largey "that he would have to be able to demonstrate to Mr. Gomez Web Solutions' capabilities to do this work" (*id.*) in order to convince Gomez to consider IT Web as a potential partner.

Finally, Davis admitted that he suggested IT Web to Murphy as a web solutions provider for the Contentville project. Davis stated that he "told Frank [Murphy] that since Design was no longer under consideration that [he] felt [he] knew somebody who might be able to help him out." (*Id.* at 216.)

The Court further finds that Davis took the additional steps of contacting and/or attempting to contact Gomez directly on numerous occasions in late November and possibly early December 1999 to encourage him to consider IT Web for the Contentville contract. The Court bases this determination on Gomez's testimony that Davis aggressively pursued him in an attempt to secure the Contentville contract for IT Web, and that Gomez was always under the impression that Davis was working for IT Web, rather than for Design.[3] (*See* May 11 Tr. at 68, 70, 71.) Gomez stated that Davis made so many attempts (10 to 15, according to Gomez) to contact him in reference to the Contentville project that he became "annoying." (*Id.* at 72.)

The Court credits this portion of Gomez's testimony for the following reasons. First, it was essentially uncontroverted at trial. Davis's counsel's cross-examination of Gomez did not call into question or even address his testimony that Davis made repeated attempts to contact him on behalf of IT Web. (*See* May 10 Tr. at 145–46.) Davis, while stating that he did not remember having called Gomez on as many occasions as Gomez testified to remembering, never squarely denied having made so many attempts to contact Gomez on behalf of IT Web. In addition, Davis's testimony on this subject was internally inconsistent and appeared somewhat evasive at times.[4]

Second, though Gomez's accounts of some details was directly at odds with

**3.** Gomez also testified that Davis arranged for him to visit the IT Web facilities and that he might have seen Davis at the initial Contentville meeting at IT Web's facilities after IT Web had been awarded the contract. In addition, he denied ever having learned of Design other than through the instant litigation, thus implying that Davis never encouraged him to consider Design for Contentville. In light of conflicting credible testimony on these subjects by Largey, Murphy and Davis, though, in combination with Gomez's own statement that his memory on these subjects was vague, the Court finds no preponderance of the evidence that Davis did in fact arrange for Gomez to visit IT Web or that he never advocated for Design in his communications with Gomez.

**4.** Initially, Davis testified that he did not "speak to Mr. Gomez about Infotech with respect to the Contentville contract." (May 10 Tr. at 7.) He later said, however, that he "believe[d][he] told [Gomez] [he] believed Web Solutions had capability" to perform the

those of other witnesses and his recollection of those events may have been faulty to that extent, there is no evidence on the record suggesting that Gomez might not have been an impartial witness or otherwise calling into question his credibility. Moreover, based on its observation of Gomez's demeanor during his extensive direct, cross-, and re-direct examination, the Court finds no reason to doubt his truthfulness.

Third, Murphy made statements at his deposition that to some extent corroborate Gomez's testimony that Davis made repeated attempts to contact him. (*See* May 16 Tr. at 141.) Murphy also indicated that at least some of Davis's attempts to contact Gomez were made on behalf of IT Web. Murphy stated, for instance, that Davis told him that they "could explore another way to win the [Microsoft] business if it wasn't possible for Design Strategy to win the contract" (*id.* at 138) and that "[i]f for some reason beyond his control [Davis] was not able to win it for Design [he] had the impression that . . . he could change employers and win the business but it was clearly after—after it was unwinable [by Design]." (*Id.* at 139.)

### C. THE IT DEFENDANTS' LACK OF AWARENESS OF OR PARTICIPATION IN DAVIS'S ATTEMPTS TO OBTAIN THE CONTENTVILLE CONTRACT FOR IT WEB

With respect to the facts underlying Design's claims against the IT Defendants, the Court finds as follows. First, there is no evidence that the IT Defendants encouraged Davis to provide them with information concerning the Contentville contract, or that they in any way affirmatively sought his assistance in obtaining it. Instead, the record shows that Davis volunteered information to the IT Defendants about the project on his own initiative and that the only action IT Web took in response was to independently pursue with Microsoft the leads that Davis had offered. To the extent that any affirmative evidence was presented on this issue, it supports the IT Defendants' position that they had no active involvement in Davis's efforts to procure the Contentville contract for IT Web. Goullet explicitly denied having "ask[ed] [Davis] about any projects that he might be able to deliver [to IT Web]." (May 12 Tr. at 105.) He also denied having authorized Davis to "act in any way on behalf of Infotechnologies Web Solutions" or to "solicit business on behalf of IT Web Solutions." (*Id.* at 110.) Largey testified that he was not aware of Davis's communications with Gomez on behalf of IT Web. (*Id.* at 223.) There is no basis in the record before the Court to discredit or disbelieve Goullet's or Largey's testimony on these subject.

In addition, the Court finds that neither Goullet nor Largey, nor any other Infotech or IT Web officer, ever offered Davis a job or payment in exchange for referral of the Contentville business or other information about opportunities with Microsoft. (*See id.* at 110.) Although it is undisputed that IT Web—sometime after Davis commenced his employment there—approved a very high commission rate for Davis's earnings attributed to Contentville,[5] there

---

Contentville project. (*Id.* at 171.) In addition, when asked if he had called Gomez "no less than 20 times" about the Contentville project, Davis did not deny having done so, instead stating that he did not "recall calling him that many times." (May 10 Tr. at 112.) When asked if he had called Gomez "once," Davis again replied that he did not recall.

When he was asked the same question a second time, though, Davis stated that it was "very possible." (*Id.*)

5. Goullet acknowledged that a 50 percent commission rate exceeded industry standards. He also explained, however, that in awarding Davis such a large portion of IT Web's profit

is no compelling evidence that that commission was intended or functioned as a pre-arranged compensation agreement to reward Davis for his role in assisting IT Web in securing the Contentville contract. On the contrary, IT Web's letter to Davis offering him a position with the company did not reflect any commission rate. (*See* May 11 Tr. at 263–64.)

## D. *COMPETITION BETWEEN DESIGN AND IT WEB*

Another issue disputed at trial and relevant to Design's claims against both Davis and the IT Defendants is whether Design and IT Web were sufficiently competitive in the information technology business to render Davis's advocacy on behalf of IT Web adverse or potentially adverse to Design's business interests. The parties agree that Infotech was a competitor of Design in the staffing business at the relevant time and that it has provided staff augmentation services for the duration of its existence. (*See* May 11 Tr. at 174.) They disagree, though, as to whether or not Design should be viewed as a competitor of IT Web in relation to web solutions services. For a determination of this matter, an understanding of the computer industry and financial relationship between IT Web and Infotech is necessary. The Court makes the following factual findings in this regard.

In 1998, Infotech created IT Web as a software solutions services division of Info-

tech. (*See id.*) For the years 1998 and 1999, according to Goullet, "[t]he tax return that reported income and expenses and profits and losses ... on behalf of Infotechnologies Incorporated ... include[d] the figures from Infotechnologies Web Solutions." (*Id.* at 194.) In addition, IT Web shared office space with Infotech, the president of IT Web was on the payroll of Infotech (*id.* at 176), and, "for all intents and purposes from a tax standpoint and from a financial standpoint ... Infotechnologies and Infotechnologies Web Solutions ... were all under the same umbrella in 1998 and 1999." (*Id.* at 195.)

IT Web, however, did maintain "separate banking and accounting and accounting managers" in 1999. (*Id.* at 173.) IT Web was incorporated and hence officially became a separate corporate entity from Infotech in February 2000 (*see id.*), but was subsequently reacquired by Infotech (*see id.* at 172). Thus, although IT Web existed as a separate corporation for some time, at the time Davis promoted it for the Contentville project, it was still a division of Infotech.

In addition, the technical personnel services provided by Infotech overlapped to some extent with those provided by IT Web. As Goullet testified, IT Web had "on-site programmers, developers, information architects, application architects, people that are performing off-site project and software development work." (May 11 Tr.

he was attempting to match Davis's compensation at Design, and that the high commission rate from Contentville was offset by Davis's not receiving a fixed annual salary from IT Web, which he had from Design. (*See* May 11 Tr. at 264; May 12 Tr. at 122–123, 156; May 17 Tr. at 146, 179, 193.) Also relevant in assessing whether the commissions IT Web paid to Davis from Contentville were disproportionate, thereby potentially supporting an inference of some impropriety in the arrangement, is that in the commission schedule Kalli prepared Davis's rate applica-

ble to any IT Web business he produced was seven percent, substantially less than the 20 percent of his sales that he had earned at Design. Viewing this commission structure as a whole lends plausibility to Goullet's assertion that Davis's commissions from Contentville were intended to make good on a promise to equalize his compensation over time, and not to reward him as a quid pro quo agreement for diverting to IT Web a business opportunity that properly should have gone to Design.

at 178.) Goullet also affirmed that "staffing work would be work that you would provide to clients or customers that needed people with particular skills within the IT or computer related areas," including programmers and developers, and in "rare" cases information architects and application architects. (*Id.* at 179.) Therefore, both entities sought to connect clients in some manner with individuals who possessed some of the same specialized computer skills.

Although the services provided by Design and IT Web thus overlapped as to their staffing-related components, the Court finds that they differ in that Design had no substantial competence or volume of business in providing web solutions. While Newmark professed an interest in developing Design to encompass web solutions work, pointing, for instance, to a draft 1997 business plan indicating such a goal, the evidence presented at trial does not support a finding that Design was actively engaged in the web solutions business in 1999. Although Newmark referred to several specific examples of work Design had performed or was engaged in that he characterized as web solutions work, the Court finds this evidence unpersuasive. The projects Newmark described appear episodic. Others were performed not by Design, but by another business entity, of which Newmark was part owner, known as Network Integration Services, Inc. ("NISI"), or by an independent entity known as Object X. Also, some entailed not strictly web solutions work performed at a distinct lab dedicated to these services, but a combination of staffing services with attendant software project components. Thus, the Court concludes that, in the latter half of 1999, Design was not engaged in web solutions services in any demonstrable, material way as part of its ongoing business services, and did not actually have in place an operating computer lab facility with the business experience, the personnel and technical support necessary to provide web solutions work.

## E. REASONS FOR DESIGN'S FAILURE TO OBTAIN THE CONTENTVILLE CONTRACT

Also relevant to certain of Design's claims against Davis and the IT Defendants is whether Davis's efforts on behalf of IT Web played a role in causing Design not to be awarded the Contentville contract. The evidence presented at trial supports a finding that Design would not have obtained the Contentville contract even if Davis had not promoted IT Web.

First, Murphy testified unequivocally that Design was never in serious contention for the Contentville project because it did not satisfy the vendor requirements Microsoft and Brill had established. Far from viewing Design as a close contender for the project, Murphy testified that, from the beginning, he "knew it would be a stretch [for Design] to win the business and [he] also knew ... that time would be of the essence and it would be unlikely that a deal could be struck." (May 16 Tr. at 146.) Indeed, he specifically stated that Gomez rejected consideration of Design on this basis. (*See id.* at 134.)

Gomez expressly stated that ability to deliver a product promptly within the intense timeframe and pressure the project was under, prior web solutions business experience and an operational computer lab were firm requirements, the absence of which had prompted him to disqualify other vendors, even one with which Microsoft had prior business experience. (*See* May 11 Tr. at 76, 119, 127.) This evidence is sufficiently persuasive to support a finding that Microsoft rejected Design as a potential web solutions provider for Contentville not because Davis promoted IT Web, but because Microsoft determined that Design did not meet the minimum vendor selec-

tion criteria or the readiness timetable Microsoft sought with regard to the Contentville contract. That Newmark felt he could mobilize the necessary resources promptly upon being awarded a contract, or arrange for the project's web solutions services to be delivered through a subcontract does not alter the reality that the Microsoft officials in charge of the vendor selection asserted that Design itself lacked the necessary qualifications to perform the Contentville project and on that basis rejected Design from consideration.

Moreover, the evidence demonstrates not only that Davis played no instrumental role in depriving Design of a real business opportunity, but that he may have been a liability. According to Gomez, in Davis's pursuit of the project he was so persistent and annoying, that, when Gomez ultimately had to decide, at first he actually rejected IT Web precisely because of the role Davis had played. (*See id.* at 133–134.) There is no indication in the record that Design would have fared any better, or that Davis would have been less of a business hindrance, had Davis solicited Gomez as actively on Design's behalf.

## F. DESIGN'S EXPRESS CONSENT

The Court finds that even if Davis had informed Newmark about the Contentville project as an opportunity for Design, there is no evidence that Design knew that Davis had referred the business to IT Web or that it tolerated or expressly consented to Davis's doing so. Davis did not argue or produce any testimony or documentation to the contrary.

## III. CONCLUSIONS OF LAW

### A. DESIGN'S CLAIMS

In *Design I*, the Court set forth the legal standards and case law governing Design's remaining claims. The applicable principles and authorities are summarized below.

### 1. Breach of Fiduciary Duty

■ Under New York law, an employee owes a duty of good faith and loyalty to his employer. *See Western Elec. Co. v. Brenner*, 41 N.Y.2d 291, 392 N.Y.S.2d 409, 360 N.E.2d 1091, 1094 (1977); *Maritime Fish Prods., Inc. v. World–Wide Fish Prods., Inc.*, 100 A.D.2d 81, 474 N.Y.S.2d 281, 285 (1st Dep't 1984). As the New York Court of Appeals has explained:

> The employer-employee relationship is one of contract, express or implied.... [F]undamental to that relationship is the proposition that an employee is to be loyal to his employer and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.

*Brenner*, 392 N.Y.S.2d 409, 360 N.E.2d at 1094 (internal quotation marks and citations omitted).

In addition to being prohibited from acting inconsistently with his duty of loyalty, an employee has "an affirmative duty at all times to act in his employer's best interests." *Maritime Fish Prods., Inc.*, 474 N.Y.S.2d at 286. The New York Court of Appeals emphasized the broad nature of this duty in *Elco Shoe Mnfrs., Inc. v. Sisk*:

> [N]o man can serve two masters with equal fidelity when rival interests come into existence. Agents are bound at all times to exercise the utmost good faith toward their principals. They must act in accordance with the highest and truest principles of morality.

260 N.Y. 100, 183 N.E. 191, 192 (1932).

■ An employee who is found to have breached his duty of loyalty "is generally disentitled to recover his compensation, whether commissions or salary." *Feiger v. Iral Jewelry, Ltd.*, 41 N.Y.2d 928, 394 N.Y.S.2d 626, 363 N.E.2d 350 (1977) (citing

Restatement (Second) of Agency § 469). Disloyal employees may be held liable for their compensation even if "the principal suffered no provable damage as a result of the breach of fidelity." *Id.* (citing *Wechsler v. Bowman,* 285 N.Y. 284, 34 N.E.2d 322, 326 (1941)).

### a. *Liability*

██ Davis's advocacy on behalf of IT Web as a partner with Microsoft for the Contentville project was inconsistent with his duty of loyalty to Design. As indicated above, the Court finds that Davis not only informed Goullet and Largey about the Microsoft project on his own initiative, but provided them with specific instructions concerning what they should do and when in order to secure a contract with Microsoft; that Davis suggested IT Web to Murphy as a candidate for Contentville and specifically represented to him that IT Web had the requisite capabilities for that project; and that Davis made numerous phone calls to Gomez to encourage him to consider IT Web for the Contentville project.

In order for Davis's efforts to advance IT Web's prospects as regards the Contentville opportunity to constitute a breach of his duty of loyalty to Design, it must further be established that Design and IT Web were competitors. In *Elco Shoe,* the New York Court of Appeals provided guidance regarding how to make this determination for purposes of determining whether an employee has breached his duty of loyalty. That case involved an employee of a shoe manufacturer who developed and independently sold his own line of shoes. The Court of Appeals explained that, in that case "[t]he question ... [was] not so much a technical definition of the word 'competition' as used by shoe dealers as it [was] a question of loyalty and fair dealing." *Elco Shoe,* 183 N.E. at 192 (citing *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545 (1928)).

In keeping with this approach, the Court concludes that, even if strictly speaking Design and IT Web were not themselves competitors in the web solutions niche of the computer industry, they had sufficiently conflicting business interests at the relevant time to be deemed competitors in the present context. During the time when Davis attempted to procure Contentville for IT Web, that entity was a division of Infotech and its success directly contributed to Infotech's, which did squarely compete with Design in the staffing business. Therefore, Davis's efforts to provide business to IT Web constituted, albeit indirectly, support for a competitor and hence cannot be reconciled with his duty of loyalty to Design.

Davis's efforts on behalf of IT Web may also be seen as a violation of Davis's duty to act affirmatively in Design's best interest because Newmark had expressed to Davis an interest in expanding Design's services to include web solutions. Even if Newmark took few if any concrete steps to realize his stated purpose of developing Design in this way, he had at least expressed some desire to do so. Davis was aware of this interest. In consequence, even if Davis believed that Newmark in fact had no real intention or ability at that time to develop a web solutions business, his assistance, without Newmark's knowledge or express consent, to another company trying to establish itself in the same field was inconsistent with his duty to exercise "the utmost good faith toward [his] principal[ ]." *Elco Shoe,* 183 N.E. at 192.

Further, because Microsoft was a client of Design for staffing services, and because under some circumstances staffing work may incorporate elements of web solutions work, Davis's referral of Microsoft to a web solutions entity that at the time was a division of a staffing company competing in that line of business with

Design created a risk that Microsoft might divert to Infotech staffing opportunities that it had previously awarded to Design. For Davis actively to contribute to that risk, without Newmark's knowledge or express consent, was inconsistent with Davis's duty to act in Design's best interest.

Finally, the Court must take account of two other contextual points. First, in almost any business, Microsoft would be an extremely significant client, and particularly so for a company that provides information technology services. Whatever the level of Design's revenues Microsoft work represented, the ability to claim Microsoft as a client in the information technology staffing business undoubtedly was of great value to Design at the time of the events in question. For Davis, without informing Design, to make repeated efforts to promote the solutions services of another entity to such a significant client, where that other entity was a division of a staffing company that directly competed with Design, was to violate his duty of loyalty to Design.

Second, further providing telling context for Davis's conduct, at the time in mid- to late November 1999 when he engaged in these activities, Davis already had had at least two interviews and several telephone conversations with Goullet, Largey and Kalli concerning his possible employment with IT Web. Accordingly, to that extent, Davis was hardly a disinterested agent seeking to do a favor for an important client. Rather, at that point he had strong personal reasons and business incentives for IT Web to be selected by Microsoft for the Contentville services.

b. *Forfeiture—Applicability*

■ Having determined that Davis violated his duty of loyalty to his employer, the Court must consider whether that violation warrants forfeiture of his relevant compensation and, if so, to what extent. "New York courts have used two different standards to determine whether an employee's misbehavior warrants forfeiture." *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 201 (2d Cir.2003). One standard, traced to dictum in the 1885 case of *Turner v. Konwenhoven,*[6] holds "that a disloyal employee forfeits promised compensation only when the 'misconduct and unfaithfulness ... substantially violates [sic] the contract of service.'" *Id.* (quoting *Turner*, 100 N.Y. 115, 2 N.E. 637, 639 (1885)) (further citation omitted). The other standard, deriving from the 1886 case of *Murray v. Beard*, holds that "[a]n agent is held to *uberrima fides* in his dealings with his principal, and if he acts adversely to his employer in any part of the transaction, or omits to disclose any interest which would naturally influence his conduct in dealing with the subject of the employment, it amounts to such a fraud upon the principal, as to forfeit any right to compensation for services." *Id.* at 202, 7 N.E. 553 (quoting *Murray*, 102 N.Y. 505, 7 N.E. 553, 554 (1886) (internal quotation marks omitted)). Thus, while the *Turner* standard appears to condition the propriety of any amount of forfeiture of an agent's compensation for services on a threshold showing that an agent's disloyalty constituted a "substantial violation" of the terms of his employment, the *Murray* doctrine appears more absolute, suggesting that forfeiture is warranted in all cases of disloyalty.

---

**6.** The North Eastern Reporter version of this case uses the spelling "Konwenhoven," while the New York Reports version (100 N.Y. 115, 2 N.E. 637) uses the spelling "Kouwenhoven."

The court in *Phansalkar* did not attempt to reconcile these two standards because it determined that the behavior of the employee in that case warranted forfeiture under either rule. *See Phansalkar*, 344 F.3d at 202. Although the instant case presents a closer question than did the extreme misconduct at issue in *Phansalkar*, the Court nevertheless finds that it need not determine which of the two standards should be applied because forfeiture would be called for under both.

Forfeiture is warranted under the *Murray* standard because Davis acted "adversely to his employer." Davis's actions aimed at promoting the success of a company that was a division of a direct competitor of Design, created a risk of diverting a valuable client away from Design, and contravened Newmark's stated interest in expanding Design's business to encompass web solutions work.

Applying *Turner*, forfeiture is also warranted on the grounds that Davis committed a "substantial violation" of the terms of his employment. Though the *Phansalkar* court did not provide explicit criteria or guidance for determining whether a given violation of an employee's duty of loyalty is substantial, it did note that "[l]ower New York courts ... have found disloyalty not to be 'substantial' only where the disloyalty consisted of a single act, or where the employer knew of and tolerated the behavior." *Phansalkar*, 344 F.3d at 201–02. The Defendants in the instant case do not claim that Design knew about, tolerated or expressly consented to Davis's activities on behalf of IT Web. In addition, the Court finds that Davis cannot avoid forfeiture by claiming that his disloyalty consisted of a "single act."

In support of the claim that New York courts have found disloyalty to be not substantial where the disloyalty consisted of a single act, the *Phansalkar* court cited *Schwartz v. Leonard*, 138 A.D.2d 692, 526 N.Y.S.2d 506 (2d Dep't 1988). The instant case is clearly distinguishable from *Schwartz*. That case involved a dispute between two lawyers, Lawrence Leonard ("Leonard") and Hyman Schwartz ("Schwartz"). Schwartz hired Leonard to assist him in his practice of immigration law and agreed to pay him fifty percent of the fee for the matters on which he worked. Approximately three months after Leonard was hired, he secretly began to look for a separate office due to "friction" that had developed between him and Schwartz. After securing a new office for himself, but while still employed by Schwartz, Leonard removed from Schwartz's office the files of the cases on which he had been working. Leonard removed the files "after the close of business" on a Friday. On the following Monday, Leonard called Schwartz to inform him that he had removed the files, but that he was "willing to honor the 50–50 fee arrangement." *Schwartz*, 526 N.Y.S.2d at 507. Schwartz filed a grievance against Leonard with the Department Disciplinary Committee of the State Supreme Court, Appellate Division, resulting in an order directing Leonard to return the files, with which he complied. Schwartz then filed suit in state court. After a bench trial, Schwartz was awarded compensatory damages covering all of the fees that he had paid Leonard during the period of his employment and attorney's fees, as well as punitive damages.

On appeal, the Appellate Division reduced the compensatory damages award and struck the punitive damages award in its entirety. The court stated several reasons for reversing the trial court's finding that Leonard was required to forfeit "all the commissions paid to [him] during his employment." *Id.* at 508. One of these reasons was the court's determination that the removal of the files "was a single act and not a persistent pattern of disloyalty." *Id.* The Court also based its conclusion on

its findings that the removal of the files "essentially terminated [Leonard's] employment;" that this act "was nothing more than a misguided attempt to protect [Leonard's] own and the interests of those clients upon whose cases he had worked" because he believed that Schwartz was "incompetent;" and that "[t]here was insufficient evidence to show that the defendant ... was furthering his own interest at the expense of the plaintiff." *Id.* Thus, while the court in *Schwartz* clearly relied on the fact that Leonard's disloyalty consisted of a single act in determining that he was not required to forfeit his entire compensation, its reasoning and holding do not support the conclusion that a single act of disloyalty necessarily does not warrant any amount of forfeiture.[7]

In any case, although Davis's wrongdoing related to a single business opportunity, it did not consist of a "single act" in the sense that Leonard's did. While Leonard is described as having removed files from his employer's office on a single occasion, the Court has found that Davis's efforts on behalf of IT Web involved more extensive conduct spanning a longer time, including discussions with Murphy, several calls and other attempts to contact Gomez, and communications with Goullet and Largey, in mid- to late November and probably lasting into early December 1999.

Moreover, Davis's behavior is materially distinguishable from Leonard's in several other crucial respects. First, though Davis's actions occurred shortly before he resigned, they did not "essentially terminate" his employment. More importantly, as pointed out above, in advocating for IT Web in connection with Contentville, Davis's attempt to further his own interests created a risk of potential detriment to Design's business. Given that Davis was contemplating leaving Design and going to work for IT Web at the time that he promoted IT Web's services to Gomez, he had a material interest in IT Web being awarded the contract. In addition, Davis's efforts on behalf of IT Web contravened Design's interest both in retaining Microsoft as its own client for staffing services and potentially in ultimately developing Design as a web solutions provider.

*Schwartz* and the instant case are further distinguishable in another respect. Davis, unlike Leonard, never informed his employer of his actions. Thus, *Schwartz* does not support a finding that Davis's disloyalty consisted of a single act and did not constitute a "substantial violation" of his duties to Design.[8]

---

7. Moreover, it is not clear from the Appellate Division's published opinion whether or not it concluded that Leonard was not required to forfeit *any* compensation. Although it seems likely that the appellate court did draw this conclusion, the court's only explicit holding was that the record did "not support the award to the plaintiff of $10,968.75 representing *all* the commissions paid to the defendant during his employment." *Schwartz*, 526 N.Y.S.2d at 508 (emphasis added). The Appellate Division found that the defendant was, however, "entitled to damages in the sum of $1,896.79, representing the defendant's concession at oral argument that said sum was owed." *Id.* The court did not specify the basis for this debt.

8. In his Pre–Trial Memorandum of Law, Davis argues that "Design is not entitled to forfeiture of any compensation paid to Davis in this case because there is no evidence of a pervasive pattern of disloyalty." (Defendant Davis' Pre–Trial Memorandum of Law, dated April 25, 2005, ("Davis Mem.") at 10.) In support of this claim, Davis cites *Phansalkar*, *Turner*, and *Schwartz*. None of these cases, however, requires such a pattern as a condition of forfeiture. *Phansalkar*, in addition to explicitly reserving judgment on whether an employee's violation of his duty of loyalty must be substantial in order for forfeiture to be warranted, did not state that there must be a pervasive pattern of disloyalty in order for that disloyalty to be substantial. Similarly, although the *Turner* court suggested that a pervasive pattern of disloyalty might be neces-

Even if Davis did not engage in conduct that rose to the level of a pervasive pattern of disloyalty, the Court nevertheless finds that Davis's disloyalty substantially violated his duty to act in Design's best interest. This determination is based on four considerations. First, while arguably Davis's merely informing IT Web and Microsoft about one another's interests in relation to the Contentville project by itself may not qualify as a substantial violation of Davis's duty of loyalty, the Court finds that Davis's persistence in promoting IT Web for the Contentville contract by repeatedly contacting Murphy and Gomez significantly aggravates the degree of his disloyalty. In addition, Davis did not merely mention the Contentville project casually to Goullet and Largey. Rather, he told them whom to contact at Microsoft, that they should act quickly, and what they would need to convey to Microsoft in order to win the project.

Second, the Court assigns substantial weight to two considerations described above: that Davis had some personal interest in IT Web being awarded the contract given his then ongoing negotiations for employment with IT Web, and that pursuing that interest contravened Design's own best interest, given that IT Web was at that time a division of a direct competitor of Design. Third, though Davis's disloyalty related to a single business opportunity, it was a potentially extremely lucrative opportunity and involved a very significant client. Finally, Davis's failure ever to inform Newmark about his referral of Microsoft to IT Web, let alone obtain his consent to do so, is a crucial feature of disloyal conduct which, com-

bined with the other circumstances, renders that disloyalty substantial.

### c. *Forfeiture—Extent*

■ The Court's determination that Davis's disloyalty warrants forfeiture under either of the New York standards prompts consideration of the next point of this inquiry: how much forfeiture is appropriate. The Second Circuit explained in *Phansalkar* that, while "[e]arly decisions by the New York Court of Appeals suggest that New York's law of forfeiture requires disloyal agents to forfeit all compensation, without limitation, ... [m]ore recent decisions by lower New York courts ... have endorsed the principle that faithless servant forfeitures can be limited in specified circumstances." *Phansalkar*, 344 F.3d at 204. More specifically, "New York's lower courts have endorsed limiting forfeiture to compensation paid *during the time period* of disloyalty. This limitation of forfeiture developed in the context of cases in which agency agreements apportioned compensation to 'periods of time.'" *Id.* at 205 (quoting *Musico v. Champion Credit Corp.*, 764 F.2d 102, 113 (2d Cir. 1985)) (emphasis in original).

Before *Phansalkar*, the Second Circuit applied this "apportionment" approach in *Musico* "to allow an employee to keep compensation for the *tasks* he performed loyally, during the time period in which he was disloyal in other work." *Id.* (emphasis in original). The Circuit Court found that such task-based apportionment, or what the court relabeled as more appropriate "limitation of forfeiture," *Phansalkar*, 344 F.3d at 188 n. 3, was permissible under New York law where the following three conditions are satisfied:

---

sary for the forfeiture of *all* of an employee's compensation, it did not hold that it is necessary for *any* forfeiture. *See Turner*, 2 N.E. at 638–639. Finally, while the court in *Schwartz* noted that the employee had not engaged in a

pattern of disloyalty, it did not state or imply that such a pattern would have been a necessary condition of any forfeiture by the employee. *See Schwartz*, 526 N.Y.S.2d at 508.

(1) the parties had agreed that the agent will be paid on a task-by-task basis (*e.g.*, a commission on each sale arranged by the agent), (2) the agent engaged in no misconduct at all with respect to certain tasks, and (3) the agent's disloyalty with respect to other tasks "neither tainted nor interfered with the completion of" the tasks as to which the agent was loyal.

*Id.* at 205 (quoting *Musico*, 764 F.2d at 114).[9]

The court in *Phansalkar* found that this task-by-task approach did not apply in that case because "the [employment] agreement call[ed] for general compensation, and [did] not limit compensation to specific amounts paid for the completion of specific tasks." *Id.* at 208. Based on the structure of Phansalkar's compensation agreement, under which the partnership's two partners had sole discretion to determine the forms and amounts of compensation Phansalkar would receive year to year and did not specify that he would be paid for any particular transaction he completed, the court found that Phansalkar was re-

quired to forfeit "all compensation awarded to him after ... the date upon which his disloyalty began." *Id.*

There is some ambiguity in this conclusion, however, because in Phansalkar's case the disloyalty continued through the end of his employment. Therefore, the Circuit Court's holding that he was required to forfeit all compensation awarded to him after the date upon which his disloyalty began could be read to mean either that a disloyal employee who receives general compensation must forfeit all such compensation during the period of disloyalty, or that such an employee must forfeit all compensation from the date the disloyalty begins through to the end of his employment, whether or not the disloyalty continues through the end of the employment.[10] The New York cases that the *Phansalkar* court cited in support of requiring forfeiture "during the period of disloyalty" do not clarify this issue because, in all of them, either the disloyalty continued until the end of the employment or the period of employment is not specified.[11]

**9.** The court in *Phansalkar* noted that one court in this District has interpreted *Musico* "as applying only where there are multiple agency agreements," *Phansalkar*, 344 F.3d at 207 n. 18 (citing *Interpool Ltd. v. Patterson*, 874 F.Supp. 616, 620–22 (S.D.N.Y.1995)). On this basis, the district court refused to limit forfeiture to commissions earned on transactions as to which the agent was disloyal. The court in *Phansalkar*, however, made clear that this was not the intention of *Musico* by explaining that the key criterion for limiting forfeiture in that case was the existence of an agreement under which the employee was compensated on a "task-by-task" basis, rather than the existence of multiple agency agreements.

**10.** On this point, perhaps a relevant consideration in *Phansalkar* was the Circuit Court's observation that "Phansalkar's disloyalty was *not* limited to a single isolated incident, but rather occurred repeatedly, in nearly every transaction on which he worked," a conduct

that persisted "over many months" until the end of his employment. 344 F.3d at 202.

**11.** In support of its statement that "New York's lower courts have limited forfeiture to the time period of disloyalty," *Phansalkar*, 344 F.3d at 206, the *Phansalkar* court cited the following cases: *GRG Group, Inc. v. Ravenal*, 247 A.D.2d 201, 668 N.Y.S.2d 352 (1st Dep't 1998); *Royal Carbo Corp. v. Flameguard, Inc.*, 229 A.D.2d 430, 645 N.Y.S.2d 18 (2d Dep't 1996); *Soam Corp. v. Trane Co.*, 202 A.D.2d 162, 608 N.Y.S.2d 177 (1st Dep't 1994); and *Bon Temps Agency Ltd. v. Greenfield*, 184 A.D.2d 280, 584 N.Y.S.2d 824 (1st Dep't 1992). In *GRG*, the court specified only the period of disloyalty, not the period of the agency relationship. In *Royal Carbo Corp.*, the court specified only the period for which employees who were found to be disloyal were required to forfeit compensation, and not the period of disloyalty itself. As the Second Circuit noted in *Phansalkar*, the court

In cases where an employee's compensation is apportioned to periods of time, the Court interprets *Phansalkar* to require forfeiture of compensation received by the employee only during the period of disloyalty. This interpretation is supported both by the *Phansalkar* court's discussion and by principles of equity, on which the requirement of forfeiture in cases of disloyalty rests.

First, the *Phansalkar* court introduces its discussion of the "limitation of forfeiture" approach by noting that "New York's lower courts have endorsed limiting forfeiture to compensation paid *during the time period of disloyalty*," *id.* at 205 (emphasis in original), and subsequently describes this approach in the same way, *see id.* at 206. The Circuit Court articulates the requirement that a disloyal employee be required to forfeit compensation for the

period commencing when the disloyalty begins and ending when the employment is terminated only upon the court's application of this approach to Phansalkar's actual period of disloyalty, which extended through to the end of his employment.

In addition, the New York cases cited by *Phansalkar* that limit forfeiture to compensation the employee received during a specific time span describe that interval as the period during which the disloyalty occurred, rather than the time from the commencement of the disloyalty through to the end of the employment. *See, e.g., GRG,* 668 N.Y.S.2d at 352 (finding that "[t]he motion court properly granted an interim award of $500,000 in management fees and brokerage commissions for the years 1991–1993, where the evidence demonstrated disloyalty during those years and there is no basis in the record for apportionment");

in that case held that the employees had "forfeited their right to compensation for services rendered from July 1, 1991, until their termination on December 6, 1991." *Phansalkar,* 344 F.3d at 207 n. 17. The *Phansalkar* court further noted that this period was "presumably, the period of disloyalty." *Id.* The Appellate Division's recitation of the facts in *Soam Corp.* indicates that that case involved a letter agreement to perform a discrete service—to represent the principal's air conditioning products for sale to the Soviet Union—rather than an employment contract calling for general compensation. Because the defendant represented a competitor's products instead, it was required to forfeit its entire commission. Finally, in *Greenfield,* the court dismissed the defendant employee's counterclaim for fees allegedly due to her for the completion of certain tasks, but did not specify the relation of those fees to the employee's disloyal acts.

The *Phansalkar* court also noted that, in a later portion of the *Greenfield* litigation, reported at 212 A.D.2d 427, 622 N.Y.S.2d 709 (1st Dep't 1995) ("*Greenfield II* "), the Appellate Division reversed a grant of summary judgment to the employer who sought to recoup all commissions paid to an employee for work performed during the period of disloyal-

ty. In that case, the Appellate Division found that questions of fact remained concerning whether the employee's disloyalty consisted only of "isolated incidents" or formed a " 'persistent pattern of disloyalty' so as to warrant forfeiture of all commissions earned by [the employee] while working in plaintiff's name subsequent to the time she first [committed a disloyal act]." *Greenfield,* 622 N.Y.S.2d at 710 (quoting *Schwartz,* 526 N.Y.S.2d at 508). It is unclear whether the court meant that, if there was such a pattern, the employee would be liable for all commissions earned during the period of disloyalty, even if some commissions were earned for transactions that did not involve any disloyalty, or if the court meant that, in order for the employee to be liable for all commissions earned during the period of disloyalty, there would have to be a finding that she engaged in a pattern of disloyalty involving each one of those transactions. In any event, the Appellate Division's holding in *Greenfield* is not directly on point here because there is no indication that the employee in that case earned a salary in addition to commissions. Moreover, both of the above interpretations of *Greenfield* are consistent with the view that a "persistent pattern of disloyalty" is not a prerequisite to the forfeiture of any, rather than all, compensation.

*Maritime,* 474 N.Y.S.2d at 287 (finding that plaintiff was "entitled to the return of any compensation paid [to the defendant] during the period of disloyalty"); *Herman v. Branch Motor Express Co.,* 67 Misc.2d 444, 323 N.Y.S.2d 794, 796 (N.Y.City Civ. Ct.1971) (finding, based on review of New York cases, "that the law of New York does deprive a faithless servant of his right to compensation, but only for the period of his faithlessness."); *St. James Plaza v. Notey,* 95 A.D.2d 804, 463 N.Y.S.2d 523, 526 (2d Dep't 1983) ("[A]n employee may forfeit his right to compensation for services rendered by him during such periods of disloyalty.").[12]

Further, requiring a disloyal employee to forfeit all compensation from the date his disloyalty commenced until the end of his employment, whether or not the disloyalty persisted until that point, could have inequitable results. Such a doctrine could require an employee who was disloyal for a short period of time, but who subsequently performed his services loyally and to the substantial benefit of the employer for a long period of time, to forfeit even compensation that was earned during the later periods of loyalty beneficial to the employer.

Finally, requiring a disloyal employee to forfeit his salary even for subsequent periods of loyal service would contravene the purpose of the approach adopted in *Musico,* and reaffirmed in *Phansalkar,* of limiting forfeiture in particular cases where the employment contract calls for task-based compensation to specific tasks in relation to which the employee was disloyal. *See Phansalkar,* 344 F.3d at 207 (noting that the *Musico* transaction-by-transaction forfeiture doctrine "has not been applied in cases in which the employee is paid a salary, or receives compensation derived from transactions on which he did not work," and adhering to this limitation "where the general compensation was awarded *while the agent was acting disloyally* in some, but not all, of his work") (emphasis added). Therefore, the Court interprets *Phansalkar* to require forfeiture of salary earned during a period of disloyalty, but not during periods of loyal employment that may follow the period of disloyalty.[13]

The instant case presents a hybrid of *Musico* and *Phansalkar* in that Davis received both general compensation (his salary) and commissions, or specific amounts paid for individual tasks completed (in this case, sales of staffing services to Design clients). Applying the forfeiture methods used in both of those cases, the Court finds that Davis must forfeit the salary that he received during the period of disloyalty, but that he is not required to forfeit any

---

**12.** The last two cases listed here, *Herman* and *St. James Plaza,* were not themselves cited in *Phansalkar,* but by *Musico,* which itself was cited in *Phansalkar* for the proposition that the "limitation of forfeiture developed in the context of cases in which agency agreements apportioned compensation to 'periods of time.'" *Phansalkar,* 344 F.3d at 205 (citing *Musico,* 764 F.2d at 113).

**13.** Design claims that the *Phansalkar* Court "declared that the forfeiture of all of the disloyal employee's compensation was warranted. The forfeiture was not limited to the dates or transaction where there was a breach of his fiduciary obligations." (Plaintiff's Trial

Memorandum (undated) at 17.) It is true that *Phansalkar* does not limit forfeiture to the individual dates on which an employee is disloyal where the underlying compensation agreement does not apportion compensation to work performed on specific dates. Its holding, however, makes clear that the employee in that case was "required to forfeit all compensation awarded to him after October 15, 1999, the date ... upon which his disloyalty began." 344 F.3d at 208. Thus, to the extent that Design suggests that Davis should be required to forfeit all compensation he ever received from Design with no date limitations at all, its position cannot be reconciled with the holding in *Phansalkar.*

commissions because, unlike the defendant in *Phansalkar*, Davis's disloyalty did not arise in connection with any Design transaction from which he was entitled under the terms of his employment agreement to receive a commission, nor did it "taint[ ] or interfere[ ] with the completion" of any sales in relation to which he received a commission. *Id.* at 205 (quoting *Musico*, 764 F.2d at 114).[14]

### d. *Forfeiture—Duration*

The extent of Davis's forfeiture, therefore, depends on the duration of his disloyalty. Piecing together the testimony regarding when Davis's disloyal acts occurred, the Court finds as follows: Davis first learned from Murphy about Micro-

soft's interest in an electronic commerce opportunity around August 1999 and expressed interest in the business on behalf of Design until sometime in mid-November 1999. At about the mid-November timeframe, Davis met or otherwise communicated with Gomez and may have promoted Design as a partner for any Microsoft projects requiring web solutions assistance that might arise (*see* May 10 Tr. at 208);[15] Davis spoke to Murphy about IT Web's ability to perform the Contentville project in late November or early December 1999 (*see id.* at 8, 217); Davis called Gomez persistently and ultimately contacted him to promote IT Web during mid- to late November 1999 (*see* May 11 Tr. at 71); Davis told Goullet about Contentville sometime in late November or early December 1999 (*see* May 10 Tr. at 172, 173);[16] Davis ceased at-

**14.** The *Phansalkar* court noted that, because no New York state court had yet endorsed the limitation on forfeiture that was applied in *Musico*, that case had a " 'tenuous posture,' " but that, at the same time, "New York courts ha[d] given [the Circuit Court] no reason to retreat from, or to expand, [its] holding in *Musico*." *Phansalkar*, 344 F.3d at 206 (quoting *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 147 (2d Cir.1998)). The state of the law remains the same today. Since *Phansalkar* was decided, the New York Supreme Court, New York County, in an unpublished decision, *Schneider v. Wien & Malkin LLP.*, No. 600400/03, 2004 WL 2495843 (N.Y.Sup. Nov. 1, 2004), cited *Musico* for the proposition that "New York cases have repeatedly limited forfeiture to the period of the disloyalty." *Schneider*, 2004 WL 2495843, at *21 (citing *Musico*, 764 F.2d at 113). The court in *Schneider* further noted that "[i]t does not appear that any New York case has addressed the issue of whether forfeiture should also be apportioned to fees received by the employee for the specific tasks as to which the employee was disloyal.... Although no reported New York decision has considered the *Musico* test, this Department has not rejected limitation or apportionment of the fees to be forfeited to fees for services involving disloyalty.... The court ... holds that the *Musico* test is consistent with New York law, and sets forth viable criteria for determining whether apportionment should be made." *Id.*

**15.** The Court acknowledges that this finding is somewhat inconsistent with Gomez's testimony that he had his first conversation with Davis "sometime in the October–November time frame" (May 11 Tr. at 68) and that he had no recollection of Davis ever having promoted Design for any work with Microsoft. Gomez also testified, however, that he "barely" (*id.*) remembered his first telephone conversation with Davis and that he did not "recall definitively" whether Davis had told him at that time that he was calling on behalf of IT Web (*see id.* at 70).

**16.** Davis stated in his deposition, the relevant part of which was read into the trial record, that he called Goullet about a business opportunity with Microsoft "[a] week or two or three" (May 10 Tr. at 50) after a telephone call in December 1999, thus placing his phone call to Goullet in late December 1999. As noted above, however, Davis testified at trial that he referred the Contentville information to Goullet in late November. Goullet corroborated this version of events in his trial testimony. In addition, the record reflects that Gomez orally awarded the Contentville contract to IT Web in early to mid-December, further supporting the finding that Davis's communication with Goullet occurred in late November rather than late December 1999.

tempting to contact Gomez sometime in December and did not contact him after Gomez visited the IT Web facilities (*see* May 11 Tr. at 97–98); Gomez visited the IT Web facilities in early December (*see id.* at 83; May 17 Tr. at 223); and Gomez orally awarded the Contentville contract to IT Web in December 1999, sometime before December 14, 1999 (*see* May 12 Tr. at 16).

The Court finds that Davis was promoting Design in discussions with Murphy until sometime in November 1999, that IT Web had effectively been awarded the Contentville contract by mid-December 1999, and that most of the allegations concerning Davis's disloyalty entailing his advocacy on behalf of IT Web point to events that occurred in mid- to late November and not later than early December 1999. The Court, therefore, concludes that the period of Davis's disloyalty commenced in mid-November and lasted until early December 1999.[17] Davis received his salary every other week. During the relevant time period, Davis's compensation was apportioned to the time periods November 11, 1999 to November 24, 1999, November 25, 1999 to December 9, 1999, and December 10, 1999 to December 23, 1999.

Pursuant to *Phansalkar,* the Court finds that Davis should forfeit his salary during the periods in which he was disloyal, but that his earnings during the payment periods should not be further divided to correspond to specific days on which he was or was not disloyal. Such a further breakdown of forfeiture would contravene *Phansalkar's* intention to reject a transaction-by-transaction approach to forfeiture where the agency agreement does not apportion compensation to transactions. In

other words, the Court understands *Phansalkar* to require that forfeiture be broken down in accordance with the compensation structure provided for in the relevant employment agreement, but not further. Therefore, because Davis received his salary every two weeks, the Court declines to further subdivide the amounts that he must forfeit.

While the record is not precise as to when the disloyalty Davis engaged in commenced and ended, the Court finds that the two pay periods from November 11 to December 9, 1999 encompass the time that the preponderance of the evidence supports as the duration of Davis's disloyal acts. Thus, the Court determines that Davis must forfeit his salary for these two pay periods. For each of these pay periods, Davis received a salary of $3,269.00. The remainder of his compensation during these periods was comprised of commissions. Davis is not alleged to have acted disloyally in relation to any of the Design staffing sales on which he earned those commissions. Consequently, the Court finds that Davis must forfeit $6,538.00 to Design, plus any applicable interest.

e. *Punitive Damages*

■ Design also seeks punitive damages in connection with Davis's disloyalty. "As explained by the New York Court of Appeals, punitive damages are reserved for those 'cases where the wrong complained of is morally culpable, or is actuated by evil and reprehensible motives, not only to punish the defendant but to deter him, as well as others who might otherwise be so prompted, from indulging in similar conduct in the future.'" *Phansalkar v. An-*

---

**17.** Design endeavored at trial to elicit testimony that Davis attended the orientation meeting at IT Web on January 24 and 25, 2000 to launch the Contentville project. The only reference in the record on this point is the

statement by Gomez that he may have seen Davis at IT Web at the gathering. But Gomez's testimony in this regard is at best vague and not corroborated by any other evidence. (*See* May 11 Tr. at 97.)

*dersen Weinroth & Co., L.P.*, No. 00 CIV. 7872, 2001 WL 1524479, at *37 (S.D.N.Y. Nov. 29, 2001) (quoting *Walker v. Sheldon*, 10 N.Y.2d 401, 223 N.Y.S.2d 488, 491–92, 179 N.E.2d 497 (1961)). Although Davis's disloyal actions were knowing and reflected a prioritization of self-interested ends over his duty of loyalty to his employer, the Court finds no evidence in the record to support a finding of the level of extreme moral culpability necessary for an award of punitive damages. In this regard, the Court considers particularly compelling its finding that Davis initially sought to procure the Contentville project solutions work for Design, that he informed Newmark about the opportunity and Newmark apparently was at best ambiguous about making the necessary initial capital investment, and that it was not until much later, when Davis believed that Design was not prepared to pursue the Contentville business under the terms established by Microsoft, that Davis turned to IT Web.

### f. *Attorney's Fees*

■ The Court also denies Design's request for attorney's fees. "Under the general rule in New York, attorneys' fees are the ordinary incidents of litigation and may not be awarded to the prevailing party unless authorized by agreement between the parties, statute, or court rule." *Pollock v. Trustmark Ins. Co.*, 367 F.Supp.2d 293, 298 (E.D.N.Y.2005) (quoting *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199 (2d Cir.2003)) (internal

quotation marks omitted). Design has not cited, nor is the Court aware of, any such basis on which to award attorneys' fees in this case.

### 2. *Aiding and Abetting Breach of Fiduciary Duty*

■ In light of its finding that Davis breached his duty of loyalty to Design to the extent detailed above, the Court turns to Design's claim that the IT Defendants aided and abetted that breach.[18] Under New York law, "[a] plaintiff seeking to establish a cause of action for aiding and abetting a breach of fiduciary duty must show: '(1) the existence of a . . . violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation.'" *Samuel M. Feinberg Testamentary Trust v. Carter*, 652 F.Supp. 1066, 1082 (S.D.N.Y.1987) (quoting *IIT v. Cornfeld*, 619 F.2d 909, 922 (2d Cir.1980)). Although the first of these elements has been established, the Court finds there is insufficient evidence in the record before it to establish the second or third elements.

■ In order to prove knowledge of a breach of fiduciary duty, it is necessary to demonstrate "[a]ctual knowledge, not mere notice or unreasonable unawareness." *Id.* (citing *Terrydale Liquidating Trust v. Barness*, 611 F.Supp. 1006, 1027 (S.D.N.Y. 1984) ("Actual knowledge of a breach of

**18.** The following discussion also applies to Design's claim of wrongful inducement to breach fiduciary duty, which requires essentially the same showing as a claim for aiding and abetting a breach of fiduciary duty. *See Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1115 (2d Cir.1986) (stating that the "well settled elements of a claim for inducing or participating in a breach of fiduciary duty" are "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly

induced or participated in the breach, and (3) that the plaintiff suffered damages as a result of the breach."); *Southmark/Envicon Capital Corp. v. United Airlines, Inc.*, 132 Misc.2d 586, 505 N.Y.S.2d 491, 493 (N.Y.Sup.Ct.1986) ("To state a cause of action for wrongful inducement to breach of a fiduciary duty, plaintiff must allege a violation of a fiduciary duty, knowing inducement by defendants and damages.") (citation omitted).

duty is required; mere suspicion or even recklessness as to the existence of a breach is insufficient.")). "The burden of demonstrating actual knowledge, although not insurmountable, is nevertheless a heavy one." *Terrydale,* 611 F.Supp. at 1027.

■■■ In this case, although the IT Defendants clearly had knowledge that Davis had alerted them to the possibility of a software solutions business opportunity with Microsoft, there is no basis on which to conclude that they had actual knowledge that Davis's behavior in so alerting them was disloyal to Design. In order to have such knowledge, the IT Defendants would have to have known, among other things, that Davis had not informed Newmark about his promoting IT Web for the Contentville business, and that Newmark had not consented to Davis's informing them of such an opportunity. In general terms, Goullet, Largey and Kalli all testified that at their first interview with Davis on September 22, 1999, he told them that one of his reasons for seeking to leave Design was that Newmark was not interested in expanding Design into the web solutions business that Davis wanted to pursue.

More specifically, Goullet testified that he knew that Davis had originally tried to solicit a business opportunity with Microsoft on behalf of Design. (*See* May 12 Tr. at 85.) Design's counsel asked Goullet if he "ever [said] anything to Mr. Davis, you may have a conflict of interest with what you are giving me, or information you are transmitting to me, about this opportunity at Microsoft; you better check with your boss and see if it's okay." (*Id.*) Goullet replied that he and Davis had "discussed this" and that he thought he "asked [Davis] if he had brought it to Marsh and to Design Strategy" and that Davis had told him he had. (*Id.* at 86.) When asked if he "ever ask[ed] [Davis] if he had talked to Mr. Newmark about giving [Goullet] the

information with regard to the Contentville contract," however, Goullet replied that he had not spoken to Davis about this. (*Id.*) Under these circumstances Goullet had no reason to question Davis's statements. He reasonably could have concluded that Design was not interested in or qualified to pursue the Contentville business. He was not under any independent affirmative duty to call Design to verify what Davis had represented.

Nor is there any evidence that anyone else at Infotech or IT Web had actual knowledge that Newmark had not approved Davis's decision to inform IT Web about Contentville. There is also no persuasive evidence in the record establishing that the IT Defendants knew that Davis had encouraged Gomez to consider them for the Contentville business.

Moreover, even if the IT Defendants did have actual knowledge of Davis's disloyal behavior as to Design, as explained above, there is no evidence in the record before the Court that they provided Davis with "substantial assistance," or indeed any assistance, with respect to that behavior.

For these reasons, the Court concludes that the preponderance of the evidence does not support Design's claims against the IT Defendants. Accordingly, there is no need to address the question of the damages Design claimed in this regard represented by IT Web's alleged profits.

### 3. *Corporate Opportunity*

#### a. *The Standard*

■■■■■ · Design also seeks to hold Davis liable for any income that he derived from IT Web's Contentville contract on the grounds that that contract was a corporate opportunity for Design that Davis wrongfully diverted to a competitor. Under the doctrine of corporate opportunity, "corporate fiduciaries and employees cannot,

without consent, divert and exploit for their own benefit any opportunity that should be deemed an asset of the corporation." *Alexander & Alexander of New York, Inc. v. Fritzen*, 147 A.D.2d 241, 542 N.Y.S.2d 530, 533 (1st Dep't 1989) (citations omitted). Corporate opportunity can be applied with two different tests. The first test asks whether the corporation had an interest or "tangible expectancy" in the opportunity. *Burg v. Horn*, 380 F.2d 897, 899 (2d Cir.1967) (citing *Blaustein v. Pan Am. Petroleum & Transp. Co.*, 293 N.Y. 281, 56 N.E.2d 705, 713–14 (1944)). Tangible expectancy has been defined as "something much less tenable than ownership, but, on the other hand more certain than a desire or a hope." *Alexander*, 542 N.Y.S.2d at 534 (internal quotations and citation omitted). "The degree of likelihood of realization from the opportunity is ... the key to whether an expectancy is tangible." *American Federal Group, Ltd. v. Rotherberg*, No. 91 Civ. 7860, 2003 WL 22349673, at *12 (S.D.N.Y. Oct.14, 2003) (quoting *Abbott Redmont Thinlite Corp. v. Redmont*, 475 F.2d 85, 89 (2d Cir.1973)) (internal quotation marks omitted).

The second test asks whether an opportunity is the same as or is "necessary" for, or "essential" to, the line of business of the corporation, and whether "the consequences of deprivation are so severe as to threaten the viability of the enterprise, [that] the ... employee is deemed to have violated his fiduciary responsibility." *Alexander*, 542 N.Y.S.2d at 534–35; *see also Nassau Soda Fountain Equip. Corp. v. Mason*, 118 A.D.2d 764, 500 N.Y.S.2d 154, 155–56 (2d Dep't 1986) (concluding that the plaintiff demonstrated that the defendant may have breached his fiduciary duty by establishing and engaging in a business in direct competition that might have significantly diminished the amount of business conducted by the plaintiff).

### b. *The Tangible Expectancy Element*

■ Design's corporate opportunity claims rest on a false premise: that Design had some form of entitlement or realistic interest in the Contentville contract and that Davis deprived Design of the profits from that opportunity by diverting the project to IT Web. This theory is fundamentally flawed on several grounds. First, the Contentville project was not within Davis's control or ability to award. There is no evidence that Microsoft had given Davis such discretion, and that the contract would be granted to any vendor he recommended. Rather, it was Microsoft and specifically Gomez who controlled the selection of the vendor, a process subject to competition that entailed specified vendor qualifications. And it was Microsoft and Gomez that determined Design did not satisfy the specified qualifications and that ultimately selected IT Web because IT Web did meet the prerequisites.

Second, the record does not establish sufficient causality linked to Davis, either as to Design's not having been formally considered or as to the selection of IT Web. Design has not convincingly demonstrated that Davis caused Microsoft to eliminate Design from consideration. Nor does it establish that even if Davis had more actively promoted Design's prospects, or that if he had not ultimately referred IT Web to Gomez, the Contentville contract would necessarily have been awarded to Design. On the contrary, the record supports a finding that Design would not have been awarded the Contentville contract regardless of any efforts by Davis on Design's behalf.

First, as explained above, Design has not submitted sufficient evidence to demonstrate that it was capable of readily performing the work called for by the Contentville contract. New York courts have found a corporation's inability readily to

perform the work associated with a business opportunity to be a significant factor in determining whether or not an employee should he held liable for diverting that opportunity for his own benefit. In *Alexander*, for instance, the Appellate Division considered whether employees of a casualty/property insurance company could be held liable for secretly taking commissions on the sale of life insurance to another company. At the time that the defendant employees were collecting commissions for the sale of life insurance policies by a different company, the plaintiff employer's company was not licensed to sell life insurance. The company did, however, have a "fee-splitting arrangement with an independent licensed life insurance agent whereby the agent would follow-up on leads given to him by [the plaintiff] and share with [the plaintiff] commissions generated by such referrals." *Alexander*, 542 N.Y.S.2d at 533. The trial court granted the defendants' motion for summary judgment as to the corporate opportunity claim on the grounds that the plaintiff's "lack of a corporate life insurance license precluded it from taking advantage of any life insurance 'business opportunities' and that the fee-splitting arrangement was unlawful." *Id.*

The Appellate Division affirmed the trial court's grant of summary judgment, but "for reasons other than those given by the motion court." *Id.* According to the appeals court, the plaintiff employer's "inability to lawfully earn commissions from the sales of [life insurance] policies [did] not, *ipso facto*, warrant the conclusion that the sale by the defendants of life insurance was not the diversion of a 'corporate op-

portunity.'" *Id.* at 534. The appeals court did, however, find this consideration to be "significant."[19] *Id.* at 535. The Appellate Division cited two further considerations supporting the dismissal of the plaintiff's corporate opportunity claim. First, the court noted that the plaintiff "was aware of the profitable opportunity to service the life insurance needs of its property/casualty clients." *Id.* Second, the court found it "significant that in opposition to summary judgment plaintiff failed to offer any evidence that the defendant-employees were advised of [the commission-splitting] arrangement or of the employer's interest in such life insurance business." *Id.*

Consideration of these factors in the instant case similarly warrants a finding that the Contentville contract was not a corporate opportunity for Design. As explained above, the evidence is not sufficient to show that Design would have been able to meet Microsoft's demands for the project. In addition, although Newmark arguably professed a general interest, known to Davis, in expanding Design to provide software solutions services, one of Davis's primary contentions is that, to his frustration, Newmark refused to take tangible steps necessary to realizing that interest.

Moreover, the Court has found that Davis, unlike the defendants in *Alexander*, not only alerted Newmark to the possibility of web solutions opportunities with Microsoft, but during a substantial period of time initially promoted Design to Murphy and possibly Gomez as a partner for such opportunities. Murphy provided uncontroverted testimony that Davis told him that

---

19. The *Alexander* court made clear, however, that the plaintiff's inability to perform the work related to the alleged corporate opportunity was not relevant to whether the defendants had breached their fiduciary duty to the plaintiff. The court found that, in general, the fact that the sale of life insurance did not represent a corporate opportunity did "not mean that plaintiffs have no valid claim against employee-defendants" because "[e]vidence of [the defendants'] lack of the utmost good faith owed to their employer [was] plainly presented." *Alexander*, 542 N.Y.S.2d at 535.

Design did have the ability to perform the work called for by the Contentville contract. In fact, Murphy's testimony suggests that Davis persuaded him, against Murphy's initial inclination, to put Design in contact with Gomez. Murphy stated that, even though he did not believe that Design would be qualified to provide the services called for by the Contentville project, he nevertheless asked Davis whether Design "did major project work" and that Davis replied that Design did perform such work and "had the ability to get a web site up and running." (May 16 Tr. at 130–31.)

c. *"Necessary" or "Essential" Element*

Finally, Design has presented no evidence that the Contentville project was "necessary" for or "essential" to Design's line of business, such that deprivation of the opportunity would have been "so severe as to threaten the viability of the enterprise." *Alexander,* 542 N.Y.S.2d at 534–35. To the contrary, Design's financial statements for the years 1999 and 2000 indicate that the company's revenues actually rose by more than ten percent during the first full year in which it allegedly was deprived of the Contentville opportunity. Moreover, the record sufficiently established that web solutions services did not represent any demonstrable part of Design's line of business during the time period relevant to this action.

Design's contention that Davis's alleged diversion of Contentville somehow adversely affected the sale of Design is unpersuasive for much the same reasons. Design could not have based the company's sale transaction on proceeds of a project that Newmark testified he knew nothing about until long after Davis's departure. Nor could Design realistically have incorporated into its sale transaction any basis to count the Contentville project as part of Design business, given the absence of evidence that the opportunity was tangibly Design's to be had.

4. *Remaining Claims: Unfair Competition, Unjust Enrichment, and Overpayment of Commissions*

a. *Unfair Competition*

Design has not presented sufficient evidence to sustain its remaining claim of unfair competition. "The essence of the tort of unfair competition under New York common law is the bad-faith misappropriation, for the commercial advantage of one person, [of] 'a benefit or property right belonging to another [person].'" *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.,* 378 F.Supp.2d 448, 456 (S.D.N.Y.2005) (quoting *Volmar Distribs. v. New York Post Co.,* 899 F.Supp. 1187, 1197 (S.D.N.Y. 1995)) (further citations and internal quotation marks omitted); *see also Saratoga Vichy Spring Co., Inc. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir.1980) ("The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another."). New York courts have found unfair competition "[w]here employees, during the period of their employment ... engage in and carry out a conspiracy to compete with the employer in violation of the duties of loyalty owing by the employees." *Foley v. D'Agostino,* 21 A.D.2d 60, 248 N.Y.S.2d 121, 130 (1st Dep't 1964) (citations omitted).

Although the Court has found that Davis engaged in actions that constituted a breach of his duty of loyalty to Design, that conduct is not sufficient to give rise to a claim of unfair competition. First, as explained in the above discussion of Design's failure to prove liability under the corporate opportunity doctrine, Design has not presented sufficient evidence to demonstrate that the Contentville contract represented a benefit or property right that

"belonged" to it in any real or legal sense. In addition, the record does not support a finding that during the period of his employment Davis set himself up to engage in competition with Design on his own, or that he did so in a "conspiracy" with others.[20]

As the Court determined above, whatever efforts Davis made during the period of his disloyalty to promote IT Web he initiated and carried out on his own. There is no evidence that the IT Defendants had knowledge of Davis's failure to inform Design of his actions on behalf of IT Web, or of any "conspiracy" involving any of the IT Defendants. By definition, however, a conspiracy requires an agreement or action in concert between two or more persons. While Thoreau proclaimed that a "majority of one" sufficed to justify an act of civil disobedience,[21] the law does not recognize a conspiracy of one. See Kasada, Inc. v. Access Capital, Inc., No. 01 Civ. 8893, 2004 WL 2903776, at \*14 (S.D.N.Y. Dec.14, 2004) ("A successful claim for civil conspiracy requires a plaintiff to show the primary tort plus the following four elements: (1) a corrupt agreement between two or more persons; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) the resulting damage or injury.") (internal quotation marks and citations omitted). Moreover, Design has not provided any evidence that Davis engaged in unfair competition by leaving Design to join IT Web

or by otherwise engaging in competitive conduct at any time after he left Design. As noted above, the Court found in *Design I* that Davis's employment at Design was not covered by any employment agreement containing a non-competition, non-solicitation or confidentiality restriction. Therefore, his going to work for IT Web, even if that entity were a competitor of Design, would not have violated any duty Davis owed Design that would support a claim for unfair competition.

■ Finally, even if Davis's conduct satisfied the conspiracy to compete standard, Design has not presented sufficient evidence to warrant damages. "[T]he proper measure of damages for unfair competition ... is the loss of profits sustained by reason of the improper conduct." *Suburban Graphics Supply Corp. v. Nagle*, 5 A.D.3d 663, 774 N.Y.S.2d 160, 163 (2d Dep't 2004) (citations omitted). New York courts have made clear that damages for unfair competition are limited to profits that "the plaintiff would have made but for the defendant's wrong, and [do] not [include] the profits received by the defendants." *Id.* at 164 (citations omitted). In addition, "[t]he offending party's conduct must be a 'substantial factor' in causing the loss." *Id.* (citation omitted).

The Court has previously ruled that Design may not make any claims for lost profits due to its failure to comply with discovery rules. *See Design II*, 367

**20.** In the complaint in this action, Design asserted a claim against Davis and the IT Defendants for conspiracy to breach fiduciary duties. The Court dismissed that claim on summary judgment in *Design I*. Design's remaining claims against the IT Defendants of aiding and abetting a breach of fiduciary duties and wrongful inducement to breach fiduciary duties, though, incorporate elements of the dismissed conspiracy claim. In addition, Design's arguments at trial at some points appeared to be aimed at establishing

that Davis and the IT Defendants had entered into an agreement to engage in competition with Design. For these reasons, although Design's overt conspiracy claim was dismissed, the Court briefly addresses the elements of such a claim to explain why it cannot, based on the existing record, succeed on the merits.

**21.** Henry D. Thoreau, *Civil Disobedience* (1866), *reprinted in The Annotated Walden*, at 455, 464 (Philip Van Doren Stern ed., Bramhall House 1970).

F.Supp.2d at 633–634. Moreover, as explained above, Design has failed to present sufficient evidence to show any causal link between Davis's disloyalty and Design's failure to win the Contentville contract. Nor is there any evidence of such a connection between Davis's disloyalty and any other financial detriment to Design. As noted above, not only did Design's revenues increase during the year of Davis's departure, Design presented no evidence tending to show that its volume of business with Microsoft, or any other client with whom Davis had a relationship through Design, decreased after Davis left. Finally, no evidence was adduced at trial suggesting that, after Davis joined IT Web, he caused Microsoft or any other Design client to award staffing work to Infotech that it previously would have awarded to Design. Accordingly, the Court dismisses Design's unfair competition claim.

### b. Unjust Enrichment

 For similar reasons, with respect to its claim based on unjust enrichment, Design cannot recover anything beyond the portions of Davis's salary calculated above. "To recover on a theory of unjust enrichment under New York law, a party must establish not only that there was enrichment, but that the enrichment was at the plaintiff's expense, and that the circumstances dictate that, in equity and good conscience, the defendant should be required to turn over its money to the plaintiff." *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 797 F.2d 70, 79 (2d Cir.1986) (citations omitted). Design has not demonstrated that any enrichment that Davis gained at IT Web from commissions attributable to Contentville he derived at the "expense" of Design. The claim that Design suffered a loss as a result of Davis's disloyalty rests on two fallacies. First is that Davis was enriched by his misappropriation and use of a tangible benefit or

property that belonged to Design. The Court has rejected this claim in its finding that Contentville did not constitute a corporate opportunity for Design. Second is that, had Davis not acted disloyally, Design would have been awarded the Contentville contract and would have retained or gained some benefit from it. In the instant case, that benefit presumably would consist of profits that Design would have earned from that opportunity. As also determined above, however, Design has not met its burden to demonstrate that Davis played any role in preventing it from obtaining that business, or indeed that Design had a real opportunity of which it was deprived by Davis's misconduct. As a result, there is no basis on which to find that Davis's misconduct was at Design's expense.

### c. Overpayment of Commissions

Finally, Design argued at trial that Davis was "overpaid commissions on Merrill Lynch work undertaken by Design." (Plaintiff's Proposed Findings of Facts and Conclusion of Law, dated April 27, 2005, at 9.) Design did not plead this claim in its complaint or include it in its initial disclosures, nor has it offered any legal theory on the basis of which the Court could sustain such a claim. Accordingly, Design's claim for overpaid commissions is dismissed.

## B. DAVIS'S COUNTERCLAIM

Davis's counterclaim relates to commissions from the Merrill Lynch account that he alleges Design either paid to Manduca by lowering Davis's previous arrangement regarding his share of such commissions from 100 to 25 percent, or paid entirely to Manduca 100 percent commission on some Merrill Lynch business, or did not pay to Davis at all on any of that business after Manduca's departure. The predicate to

this claim is that Davis had some vested contractual right or other legal entitlement to the sources and rate of commissions he was paid by Design. On this point, Davis claimed that the commissions paid to Manduca violated the terms of Davis's employment agreement. But Davis produced no evidence of any contract or other legal basis to support his claim. In fact, he conceded that at all times relevant to this action Design's commission plan for all sales representatives was determined solely by Newmark, that as owner and president of Design, Newmark had the right to change the commission structure of Design sales representatives at any time, and that there was no formal agreement that limited Newmark's authority in this regard. To the same effect, Newmark presented unrefuted testimony that he had the exclusive authority at Design to create and assign geographical offices, shift sales representatives to the various accounts, and establish and change their commission structure. Similarly, Goullet testified that at IT Web, in accordance with industry practice the commission structure, including the rate paid to Davis, was established solely by him, a point Davis also acknowledged.

Based on this evidence the Court finds no ground to grant relief on Davis's counterclaim. Accordingly, the Court need not reach the question of damages in this regard and will grant judgment dismissing such counterclaims.

## IV. *ORDER*

For the foregoing reasons, it is hereby

**ORDERED** that the Clerk of Court is directed to enter judgment against defendant Marc Davis ("Davis") in favor of plaintiff Design Strategy, Inc. ("Design") in an amount of $6,538.00, representing the compensation Davis received from Design in the form of salary during the period November 11, 1999 to December 9, 1999; and it is further

**ORDERED** that the specific amounts of any appropriate prejudgment interest shall be subsequently determined and authorized by the Court upon application by Design properly supported; and it is further

**ORDERED** that Design's claims against Davis for misappropriation of a corporate opportunity, unfair competition, unjust enrichment, and overpayment of commissions are dismissed with prejudice; and it is further

**ORDERED** that Design's claims for punitive damages and attorneys' fees in relation to its claims against Davis are dismissed with prejudice; and it is further

**ORDERED** that Design's claims against defendants Infotechnologies, Inc., Infotechnologies Web Solutions, Inc., and John Goullet for aiding and abetting a breach of fiduciary duty and wrongfully inducing a breach of fiduciary duty are dismissed with prejudice; and it is finally

**ORDERED** that Davis's counterclaims against Design for unpaid commissions are dismissed with prejudice.

The Clerk of Court is directed to close this case.

**SO ORDERED.**